## JOHN L. MOEN *vs*. OLE P. LILLESTAL, *et al*.

Opinion filed November 29th, 1895.

**Vendor and Purchaser—Executory Contract.**

> Under an executory contract of sale of land, where the purchaser was let into possession, with full use of the premises, but bound to pay a stipulated price therefor, and to pay each year "so much as the one-half of all crops on said land shall amount to," *held*, that no relation of landlord and tenant could arise under such contract, nor would the parties be tenants in common of the crops grown on such land by the vendee, unless the contract created such relationship by express language or necessary implication.

**Construction—Title of Crops.**

> Contract examined, and *held* not to constitute a transfer to the vendor, or a reservation in him of any title or ownership in or lien upon the crops to be grown on the land by the vendee.

Appeal from District Court, Richland County; *Lauder*, J.

Action by John L. Moen against Ole P. Lillestal and others.

From the judgment, plaintiff and D. E. Rice, one of the defendants, appeal.

Modified.

*McCumber & Bogart*, for appellant Moen.

*S. H. Snyder*, for appellant Rice.

*W. E. Purcell* and *C. E. Wolfe*, for respondents.

BARTHOLOMEW, J. This is a contest for priority of right to the proceeds of a crop raised by the defendant Lillestal in the year 1894 on the S. W. ¼ and the W. ½ of the S. E. ¼ of section 15, township 133, range 49, in Richland County, N. D. Plaintiff claims priority as to one-half of said crop as tenant in common of the crop with said Lillestal, and as to the other half he claims priority by reason of Lillestal's abandonment of the land. Both claims are based upon the contract hereafter mentioned. The defendant Lillestal makes no claim whatever to the crop. The defendant Rice claims a portion of the crop under a chattel mortgage executed by Lillestal to him on the 6th day of August, 1892, covering all crops growing or to be grown on the said S. W.

¼ in the years 1892 and 1893, and until the debt secured by said mortgage was fully paid. This mortgage was entirely unpaid at the time of the trial. The defendant C. M. Johnson claims under a mortgage executed to him by Lillestal on November 1, 1893, covering the undivided one-half of all crops to be raised upon said premises in the years 1894, 1895, and 1896, to secure an indebtedness of $350. Nothing had been paid on this indebtedness. Johnson also claims under another mortgage upon the same property executed by Lillestal to him May 15, 1894, to secure the sum of $25.25, which was also unpaid. The defendant Van Dusen-Harrington Company claims under a mortgage executed by Lillestal to one Olsen on November 8, 1893, to secure a debt of $332.70 and interest, and covering all crops raised on said premises during the year 1894, and until the debt was paid. This debt was duly assigned by Olsen to the Van Dusen-Harrington Company, and the debt was entirely unpaid. The defendant D. M. Osborne & Co., a corporation, claims under a mortgage executed to it by Lillestal May 30, 1894, to secure $153.86 and interest, and covering all the crop to be grown in the years 1894, 1895, and 1896. All of these mortgages were duly and legally executed, and properly filed for record, so that no questions arise in that behalf. The contract between plaintiff and Lillestal, and under which plaintiff claims the crop, is too long for insertion here. We give it in substance, with quotations of the parts upon which counsel more especially rely. It is what is known as a "land contract," plaintiff being the vendor, and Lillestal the purchaser. It is dated April 20, 1892, and by its terms plaintiff agreed, upon payment by Lillestal of the sums therein specified, and the performance of certain conditions precedent, to sell and convey to Lillestal the premises already described. Lillestal was to pay therefor the sum of $3,000, in manner and at times as follows: "So much as the one-half of all crops on said land shall amount to at market price each year, and all interest to be computed at 8 per cent. annually, and paid out of the one-half belonging to second party each year until all is paid." As

security for due performance on his part, Lillestal agreed to break up not less than 50 acres of said land in each of the years 1892 and 1893, and to prepare what was already broken for crop, and to properly seed, cultivate, and harvest the crops. And, continuing, this agreement declared: "Secondly. That he will deliver at the elevator or warehouse at Dwight the one-half (½) of all the grain, crops, or produce of every kind which may be grown, raised, or produced upon said land from year to year, beginning with the year 1892; said grain to be delivered as soon as threshed, free from all costs and charges, and receipts for the same to be made out in the name of the party of the first part, and to be at once sent to him. Thirdly. That the party of the second part shall have the option of the sale of said grain from year to year up to the first day of December, but on and after that date this option shall cease, and the sole right of sale belong to the party of the first part. Fourthly. The proceeds of the sale of said grain or produce shall be applied as follows: Firstly, to the payment of taxes on said land, if any are delinquent; secondly, to the payment of the insurance on said grain, and any costs or charges for storage or handling; thirdly, to the payment of the principal, until the same has been paid in full. Fifthly, The party of the second part covenants and agrees to duly execute, and place on file or record, as the case may be, a chattel mortgage on one-half (½) the entire crop sown, planted or to be raised upon said premises; said chattel mortgage to be drawn in favor of the party of the first part, and to be a first or prior lien upon that portion of the crop mortgaged, and to be given on or before May 15th, 1892, and yearly thereafter until one-half (½) of the purchase price of said land shall have been fully paid, together with the interest on the same." Second party reserved the right to make further payments, if he desired, and agreed to pay all taxes and assessments; and provision was made for declaring a forfeiture in case of default, and settling the rights of the parties in the land, time being made the essence of the contract. The findings of the trial court show that Lillestal signally

failed in the performance of his covenants. This action was in fact brought to foreclose said contract, and get possession of the crop of 1894, and the other defendants were joined because they had liens of record on the crop. The findings are full, and are not questioned. The decree settles all rights in the realty, as between plaintiff and Lillestal, and no complaint whatever is made to that part of the decree. All the errors are assigned upon the court's conclusion of law as to the disposition of the crop. The court decreed the lien of defendant Johnson under his mortgage of November 1, 1893, to be a first mortgage lien upon the undivided one-half of said crop, and the lien of the Van Dusen-Harrington Company under the mortgage to Olsen dated November 8, 1893, to be a valid mortgage lien upon the whole of such crop, subject only to Johnson's lien on the undivided one-half, and the lien of Johnson under the mortgage of May 15, 1894, to be a valid lien, subject only to the two last above mentioned mortgages, and the lien of D. M. Osborne & Co. to be a valid lien upon the whole of said crop, subject to the mortgage liens already declared. All these defendants were awarded costs and disbursements against plaintiff. The defendant Rice was declared to have no lien on the crop of 1894. Plaintiff and defendant Rice appealed.

The case must turn upon the construction of the contract between plaintiff and defendant Lillestal. We reach no conclusion in the matter that is entirely satisfactory to ourselves. Remembering the nature and purpose of the contract, and the language used, we are unable to say with confidence what construction will certainly reflect the intentions of the parties. The language of the contract is somewhat ambiguous, and different provisions somewhat conflicting; but, after giving it due consideration, we are unable to say that the trial court erred in its construction of the contract. We think it did not, and we will briefly state our reason.

The learned counsel for appellant Moen, while claiming that the construction for which they contend has some support in the

express wording of the contract, yet rely mainly upon the effect of the contrat taken as a whole. They claim that the effect of this contract was to put Lillestal in possession of land belonging to Moen, with the privilege of raising crops thereon, but bound to render the one-half thereof to Moen. They then state the proposition that "every form of an agreement by which land is let to one who is to cultivate the same, and give the owner thereof, as compensation, a share of the crop, creates a tenancy in common in the crops." There are many cases which sustain this rule, although it is far from uniform. The cases are fully cited in the note to *Putman* v. *Wise*, 1 Hill, 234, as reported in 37 Am. Dec. 317-323. But for the purpose of this case we may give our unqualified assent to the rule. The agreement which it contemplates must be one "by which land is let to one who is to cultivate the same and give the owner as compensation therefor a share of the crop." A distinction was early made between a contract which conferred a license to farm the land and reserve a share of the crop to the owner, and a formal lease, which put the tenant in possession for a specific term, and required him to pay a certain share of the crop as rent. In the former case the parties were held to be tenants in common of the crops, while in the latter it was held that the entire crop belonged to the tenant until the landlord's share was set apart or paid over to him. But courts refuse to recognize the distinction when the clear effect was to give the owner a share of the crop as compensation for the use of the land, and hence it was declared, whatever might be the form of the agreement, if such were its effects, the parties were tenants in common of the crop. Such was the holding in *Putman* v. *Wise, supra,* although the granting clause there was "to lease and to farm let." A moment's consideration will show the impossibility of assimilating the contract here under consideration with contract that could come under the rule. The land was not "let" to Lillestal. It was sold to him. He became the full equitable and beneficial owner. Moen held the legal title as security. He was a mortgagee, in effect, as he admits by bring-

ing this action to foreclose the contract. Lillestal was to pay the
owner nothing for the use of the land. He himself was the
owner, and what he agreed to pay to Moen was the purchase
price of the land; and even that was not to be paid in crops, but
in money. True, the amount to be paid each year was measured
by the market value of a certain share of the crop; but Lillestal
could claim no credit until that share was sold, and then only for
the amount realized. It has been repeatedly held that "an exe-
cutory contract for the sale of land, which gives the purchaser a
right to enter and possess the premises until default in payment
of the purchase money, does not establish the relation of landlord
and tenant, when there there is no reservation of rent fixed in the
contract." 12 Am. & Eng. Enc. Law, p. 662. And this is gener-
ally true, even after condition broken. *Stone* v. *Sprague*, 20 Barb.
509; *Thompson* v. *Bower*, 60 Barb. 463; *Newby* v. *Vestal*, 6 Ind.
412; *Fall* v. *Hazelrigg*, 45 Ind. 576; *Cole* v. *Gill*, 14 Iowa, 527;
*Dakin* v. *Allen*, 8 Cush. 33; *Hill* v. *Hill*, 43 Pa. St. 528; *Stauffer* v.
*Eaton*, 13 Ohio, 322; *Klopfer* v. *Keller*, 1 Colo. 410; *Willis* v.
*Wozencraft*, 22 Cal. 607. In some states the purchaser, after
default, is treated as tenant at will. See cases cited in note 6, 12
Am. and Eng. Enc. Law, p. 662. It is clear that nothing in the
nature of this contract constituted these parties tenants in com-
mon of the crops. If they were such, it must be by virtue of the
language of the contract itself. And when we remember the
nature of the contract; that by its terms the payments might
extend over a long series of years; that the land at the time of
the sale was largely unbroken prairie; that the purchaser was
bound to put valuable improvements thereon before the maturity
of his first crop; that his failure to do so, or his failure
in any payment, authorized the vendor to at once bring his
foreclosure action, thus giving the vendor fair security for the
due performance on the part of the vendee,—remembering these
things, it seems to us, that an executory contract for the sale of a
half interest in the crop, extending over so many years, ought to
rest upon something more substantial than a possibility or an infer-

ence. Counsel place stress upon that portion of the contract which declares that the interest on the purchase price shall be "paid out of the one-half belonging to second party." This, it is claimed, is equivalent to a declaration that the other half belonged to the first party. That would be a natural inference, certainly. Still, as the parties had just provided that there should be paid annually upon the principal "so much as the one-half of all crops on said land shall amount to at market price each year." and had thus disposed of all the benefits arising from the one-half, they may have loosely used the language referring to that half the benefits of which were yet held by second party. Again, it is urged that the provision requiring second party to deliver one-half the crop at the elevator, and take receipts therefor in the name of the first party, and send same to him, indicates that half the crop belonged to him. To our minds, it has the opposite bearing. The crop, being threshed, and in a condition to be converted into money at any moment, it was highly proper that first party should then wish to get that portion of which he was to receive the proceeds in such shape that it could not be disposed of without his knowledge. But, had he considered that he had absolute title to the property thus delivered, no such precautions would have been necessary. The law would have protected him then, and any disposition of it by the second party as his own would have been a criminal act. Again, counsel urge that the fact that the second party was given the option of the sale of the property up to the 1st of December in each year indicates that he did not own the property, because if he did, his right to sell would be unquestioned, and the power need not be given him. This argument is based upon a misconception of the purpose of the provision. It was not inserted to give second party power to sell, but to fix a date when that power should cease. The contract declares, "but on and after that date [December 1st] this option shall cease, and the sole right of sale belong to the party of the first part." This was done to enable the first party to realize every year according to the intention of the contract.

Otherwise the second party might carry the crop for an indefinite time, and the vendor thus be deprived of his purchase price. Further on the contract provides: "Fifthly. The party of the second part covenants and agrees to duly execute and place on file or record, as the case may be, a chattel mortgage on one-half (½) the entire crop sown, planted, or to be raised upon said premises; said chattel mortgage to be drawn in favor of the party of the first part and to be a first or prior lien upon that portion of the crop mortgaged, and to be given on or before May 15th, 1892, and yearly thereafter until one-half (½) of the purchase price of said land shall have been fully paid, together with the interest on the same." It is not stated positively what this mortgage was to secure, but the only reasonable construction that occurs to us is that it was to be given to secure the payment of the first half of the purchase price and interest. After one-half was paid, the vendor probably regarded the land as ample security. We do not think it will be claimed that the vendor was to own one-half the crop, and have a mortgage on the other half to secure his purchase price; and yet that is the only reasonable conclusion, if appellants' contention be correct. It seems clear from this analysis that we ought not to reverse the construction placed by the trial court upon this contract.

Upon the question of the forfeiture of all of the vendee's rights by an abandonment of the land, it is sufficient to say that the court specifically finds—and the finding is unchallenged—that after the threshing of the crop of 1894 the vendee wholly abandoned said land. An abandonment at that time could not forfeit any interest in grain that had been severed and threshed. On plaintiff's appeal, this judgment must be affirmed. On the appeal of the defendant Rice, it is admitted by the learned counsel for respondents that the decree should be modified as to him. As his mortgage antedates all the other mortgages, and covers the entire crop grown on the said S. W. ¼ the trial court will modify its decree, giving him a first lien upon such crop, or

the proceeds thereof, for the amount due upon the note which his mortgage was given to secure.

With this modification, the decree is affirmed. All concur.