(No. 5787. February 14, 1933.)

THE FEDERAL LAND BANK OF SPOKANE, a Corporation, Appellant, v. A. F. McCLOUD and LULU S. McCLOUD, Husband and Wife, and JAS. H. SHIELDS, Jr., and JAMES GANNON, Partners Doing Business Under the Trade Name and Style of BUHL SEED & GRAIN CO., Respondents.

[20 Pac. (2d) 201.]

Bissell & Bird and Dana E. Brinck, for Appellant.

Frank L. Stephan, for Respondents Shields and Gannon, and E. D. Reynolds, for Respondents A. F. and Lulu S. McCloud.

BUDGE, C. J.—This action was brought by appellant to recover from respondents certain specific crops or their value in case delivery could not be had. From the record it appears that on October 15, 1926, appellant and respondents, A. F. McCloud and Lulu S. McCloud, entered into a written contract whereby the former agreed to sell to the latter certain real· property in Gooding county, at a price fixed therein. Title to the land remained in appellant at all times herein, although provision was made in the contract whereby title might be transferred to the purchasers at the

end of four years from date of the contract. The following provisions, among others, were contained in the contract:

"The parties of the second part (McClouds) . . . . further covenant and agree to turn over to the party of the first part (appellant) each year on account of said purchase price one-half ($\frac{1}{2}$) of all grain and other crops raised on all of the above described land, except for the year 1927, and for that year one-third ($\frac{1}{3}$) of said crops. The proceeds from the sale of the grain and other crops so turned over to the party of the first part shall be applied, first, to the payment of interest; and second, to the payment of the principal . . . . The parties of the second part further covenant and agree to deliver the grain and other crops hereinbefore covenanted to be turned over to the party of the first part, in the elevator or other place at Wendell, Idaho, or at some other convenient point, as the party of the first part shall direct, within a reasonable time after threshing and harvesting the same, and free from all expense or charge to the party of the first part, said grain and other crops to be delivered in the name of the party of the first part. If any of the alfalfa or clover grown on said land shall be cut for hay, the same shall be stacked on said land and divided by such agent of the party of the first part.

"It is further covenanted and agreed that, until the delivery of the grain and other crops to the party of the first part as aforesaid, during the continuance of this contract, the legal title to, and ownership and possession of all of the grain raised during each and every year shall be and remain in the party of the first part."

The McClouds went into possession and farmed the premises thereafter. Certain hay, clover seed and alfalfa seed raised upon the premises in 1930 were not divided. Mc-Cloud sold the hay and delivered the clover and alfalfa seed to respondents Shields and Gannon, at the latter's warehouse, and took a warehouse receipt therefor in his own name. Appellant thereupon commenced this action, the complaint alleging facts substantially as above set forth,

and praying judgment for the division and delivery to it of its share of the crops in question, and in the event that the same could not be divided or delivered, that it have judgment against McCloud and wife for the value of its share, and further, that in the event Shields and Gannon have appropriated any portion of appellant's share of such crops, it be given judgment against them for the value of the crops so appropriated.

Shields and Gannon answered, denying generally the allegations of the complaint, and alleging affirmatively the delivery of the seed to them and the issuance of warehouse receipt therefor; the pledge of the warehouse receipt by McCloud as security for the repayment of $1,471.70 advanced by them to McCloud; their subsequent purchase of the seed from McCloud; and that such transactions were made in good faith and without knowledge or notice, actual or constructive, that appellant owned or claimed any interest in said seed. McCloud and wife answered denying generally the allegations of the complaint.

Upon the issues so framed, the cause was tried by the court, a jury being waived. At the close of plaintiff's evidence and at the close of all the evidence motions for nonsuit made by Shields and Gannon were denied. However, the trial court in its conclusions concluded that their motion for nonsuit should be granted. Findings of fact and conclusions of law were made and filed and judgment was entered dismissing the action, from which judgment this appeal is taken.

Appellant specifies five assignments of error. The controlling question raised thereby is whether or not the crops in question were owned by appellant and the McClouds as tenants in common under the terms of the contract above referred to. In support of its contention that a tenancy in common in the crop was created by the contract, appellant relies principally upon the case of *Devereaux Mortgage Co. v. Walker*, 46 Ida. 431, 268 Pac. 37, 38, which involved the interpretation and construction of language similar to that of the contract here in question. In that case the language

was contained in a lease, creating the relationship of landlord and tenant, while the relationship of vendor and purchaser was created by the contract of sale here. The trial court held that the difference in the relationships distinguished the two cases and that the rule applied in the former was not applicable to the latter. We are unable to see any logical distinction calling for the application of a different rule, especially in view of the remarks of the court in *Lynch v. Sprague Roller Mills,* 51 Wash. 535, 99 Pac. 578, 580, namely:

" . . . . the construction which courts have uniformly placed on contracts between landlord and tenant is a safe rule to follow in construing similar contracts between vendor and purchaser."

and in view of the rule announced in 38 Cyc. 6, where it is said:

"Thus a tenancy in common springs up whenever an estate in real or personal property is owned concurrently by two or more persons under a conveyance or under circumstances which do not either expressly or by necessary implication call for some other form of cotenancy. It is held that a tenancy in common may be created by will, by descent, and the relation may be brought into existence by purchase, sale or conveyance. It is not the form of the instrument which determines the existence of the relation, but the concurrent rights in the same property at the same time, and the tenancy can arise by pledge or mortgage, by legislative grant, by prescription, by judgment or decree, by levy or execution, or by confusion or intermingling of goods, by consent, or with the owner's fault."

The language used in the Devereaux Mortgage Co. case, *supra,* is broad enough to include and cover any contract by which a tenancy in common is created.

In the Devereaux Mortgage Co. case, *supra,* the lessees covenanted: "to pay as rental for said premises one-third of all crops planted and grown upon said premises . . . . to be delivered at the warehouse in Rexburg free of cost to The Devereaux Mortgage Company."

and the lease further provided that upon default of the lessees, the lessor might terminate the agreement and in that event the lease should "become a lien on any crops that may be at that time in the ground or on the premises for any unpaid rental or any share due or to become due as rental."

. After an exhaustive review of the authorities construing similar provisions and holding that the same created a tenancy in common in such crops, the court said:

"In the contract in question the Walkers (lessees) covenanted to deliver to the respondent (lessor) at an agreed place one-third of the products of the land, not to pay a sum equal to the value of that share of the crops. They were not given the right to elect whether they would deliver crops or pay value or given authority to sell and then make division. Their contract was to deliver a share of the crops and nothing else. It simply was that the respondent should furnish the land and the Walkers should do and furnish all other things necessary to the production of a crop and that the compensation to the respondent for the use of its land and the compensation to the Walkers for their labor would be in crops in the proportion agreed upon. Contracts of this character are common and there would seem to be much in them to commend then to land owners and producers of crops. Each has the assurance that the abundance of the crops and the prosperity of the season will be controlling elements in determining the profits he will realize from the season's operations. To hold that each party has at all times an ownership in the growing crops proportionate to the share he will ultimately receive, though the right to the possession be in the producer until harvested, will best effectuate the intention of the parties, and to ascertain intention rather than classify relations created should, it would seem, be the principal concern of the court.

"If it be held that the land owner has no interest in the crops and that his only remedy is to recover a. personal judgment against the occupier for a sum equal to the value

of a share of the crops, the essential agreement of the parties is defeated, a dishonest tenant is enabled to dispose of the entire crop, his creditors can seize and sell the entire crop for the payment of their debts. The land owner is obliged to stand by, without right to process, though he may have full knowledge that the property which the other had agreed to deliver was being dissipated by him or converted by others. To construe such a contract as investing the grower with complete title and denying the land owner any title not only ignores the very purpose and intention of the parties but substitutes a different contract in the place of the contract the parties have made.

"The majority rule protects each party, assures him of his right to receive the identical property the other agreed he should have and denies the right of the other to dispose of, and his creditors to reach, more than the share to which he is justly entitled."

In the contract before us the purchasers agreed "*to turn over*" to appellant "*one half ½ of all the grain and other crops* raised on all of the above described land" in 1930; that "the proceeds from the sale of the *grain and other crops so turned over*" to appellant should be applied in payment of the purchase price and interest; that they would "*deliver the grain and other crops* hereinbefore covenanted *to be turned over*" to appellant at an agreed place, "*said grain and other crops to be delivered*" in the name of appellant; that *alfalfa and clover cut for hay should be stacked* on the land *and divided* by the agent of appellant; that appellant should have and retain title to all the grain each year "until the *delivery of the grain and other crops*" to it; that no portion of said crops shall be removed from said land until *division thereof;* and that the agreement shall be void if "default be made in the delivery of said several *payments of grain and other crops* to be grown on said land." From these provisions we think it is clear beyond controversy that the parties to the contract provided and intended that it was a certain definite part of the crops themselves that was to be delivered or turned over to

appellant, in specie, and not the proceeds of the sale of such crops, and, in the language of the Devereaux Mortgage Co. case, *supra*, the purchasers ''were not given the right to elect whether they would deliver crops or pay value or given authority to sell and then make division. Their contract was to deliver a share of the crops and nothing else.''

Respondents, in support of their contention that the proceeds of the crops and not the crops themselves were to be divided, place reliance upon *Yakoobian v. Johnson*, 102 Cal. App. 10, 282 Pac. 522, where it was held that in the absence of stipulation to the contrary, a purchaser let into possession is entitled to crops raised by him; and also on *First Nat. Bank v. Montana Emporium Co.*, 59 Mont. 584, 197 Pac. 994, holding to similar effect. These cases are clearly distinguishable for the reason that in the contract before us there are express stipulations to the contrary. *Lynch v. Sprague Roller Mills*, *supra*, *Moen v. Lillestal*, 5 N. D. 327, 65 N. W. 694, and *First Nat. Bank v. Andreas*, 92 Cal. App. 62, 267 Pac. 937, relied on by respondents, are also distinguishable as in those cases the contracts provided for a division of the proceeds arising from the sale of the crops and not, as here, for a division of the crops themselves. Respondents further contend that inasmuch as the contract contained the following provision:

''It is further covenanted and agreed that until the delivery of the grain and other crops to the party of the first part as aforesaid, during the continuance of this contract, the legal title to, and ownership and possession of all of the grain raised during each and every year shall be and remain in the party of the first part.''

a distinction was made between the grain and other crops, and that the title to the grain only having been expressly reserved, no title was reserved as to the other crops. However, it is to be noted that the title to *all* of the grain raised is reserved until the delivery of the grain and other crops as provided in the contract. This reservation of title to all of the grain was evidently intended to be in the nature of

security to compel a proper division of the crops and continued only until the crops were divided, and in no way modified or limited the provisions for division of the crops, and is not subject to the construction sought to be placed on it by respondents.

The following conclusions are justified from the foregoing: Appellant was a tenant in common with the McClouds of the crops raised on the premises in 1930; the relationship created was therefore not in the nature of an equitable chattel mortgage as contended by respondents and as found by the trial court; appellant, under the circumstances of this case, was entitled to maintain an action for the recovery of its share of the specific crops or the value thereof against the McClouds or any person to whom they had attempted to sell the same (38 Cyc. 89; note, 26 A. L. R. 1021; *Adams v. Thornton,* 5 Cal. App. 455, 90 Pac. 713), and was not limited to an action for damages.

Appellant being the owner of one-half of the crop in question, the McClouds attempted to sell property in which they had no title. The principle is well settled that a seller of personal property can convey no greater title than he had, and it makes no difference that the purchaser has no notice and is ignorant of the existence of other parties in interest. (7 R. C. L. 886; *Klundt v. Bachtold,* 110 Wash. 594, 188 Pac. 924; *Tuttle v. Campbell,* 74 Mich. 652, 42 N. W. 384, 16 Am. St. 652; *Trustees v. Williams,* 102 Wis. 223, 75 N. W. 954, 69 Am. St. 912; *Waterford Irr. Dist. v. Turlock Irr. Dist.,* 50 Cal. App. 213, 194 Pac. 757.) One who buys property must, at his peril, ascertain the ownership; and if he buys of one having no authority to sell, his taking possession in denial of the owner's right is a conversion. (2 Cooley on Torts, p. 506; 7 R. C. L. 879, 887. See, also, I. C. A., sec. 62–207, to the same effect.) While it therefore becomes unnecessary to determine whether Shields and Gannon, in purchasing the seed in question, had either actual or constructive notice of the interest of appellant therein, the record furnishes sufficient evidence to warrant the conclusion that they did have notice of appel-

lant's ownership of the property and furthermore that they had sufficient information to put them on notice.

We are in accord with appellant's contention that the trial court erred in not awarding judgment against McCloud for the value of appellant's share of the crops. Regardless of the liability of Shields and Gannon, it is logical that if the share of the crops themselves cannot be recovered, the McClouds, having converted it to their own use, are answerable to appellant for its value, and this is true not only as to the seed but also as to the other crops converted. In view of what has been said, we are likewise of the opinion that the trial court erred in granting the motion of Shields and Gannon for nonsuit, and in dismissing the action.

The judgment is reversed and the cause remanded, with instructions to enter judgment against Shields and Gannon and McCloud requiring them to deliver one-half of the seed raised upon the premises in 1930, or in the event delivery cannot be had, that a joint and several judgment be entered against them for the market value thereof; and to enter judgment against McCloud individually for one-half of the market value of the hay grown on the premises in 1930. Costs awarded to appellant.

Givens and Holden, JJ., and Koelsch, D. J., concur.

Petition for rehearing denied.

MORGAN, J., Dissenting.—This is an action to recover possession of certain clover and alfalfa seed, or for its value if possession cannot be had, and the right to maintain it depends upon ownership of the seed. The following pertinent facts, in addition to those quoted from the contract in the foregoing opinion, also appear therein: The land consists of 320 acres; the agreed purchase price was $18,488.48, which was to bear interest at five and one-half per cent per annum. The contract contains the following further provisions:

"If at the end of the fourth year from date of this contract, the principal has not been reduced through sale of crops to $9,000.00, the purchasers then agree to pay the difference between the balance due and $9,000.00, in two equal annual payments, the first instalment to be due and payable on the 15th day of October, 1931, and the second instalment on the 15th day of October, 1932, such amounts to be secured by a crop mortgage on all crops to be grown on said land during said years, such crop mortgage to be duly executed and delivered to the party of the first part on its demand. Upon the payment of said instalments and all interest then accrued on said purchase price, the purchasers shall be given title to the said property and shall at the same time execute a first amortization mortgage on said land and execute a note for $9,000.00, payable to the party of the first part, to cover the balance of said purchase price."

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"It is further covenanted and agreed that should default be made in the delivery of said several payments of grain and other crops to be grown on said land, or any of them, or any part thereof, or in any of the covenants herein to be kept or performed by the parties of the second part, then this agreement is to be void at the election of the party of the first part, time being the essence of this agreement, and in such case all the right and interest of the parties of the second part hereby created or then existing shall utterly cease and determine, and the property shall revert to and revest in the party of the first part without any declaration of forfeiture or act of re-entry, and said parties of the second part shall have no right of reclamation or compensation for money paid or improvements made, as absolutely, fully and perfectly as if this agreement had never been made, and in such event such payments shall be retained by the party of the first part as compensation for the use and occupancy of said property by the parties of the second part and as rental therefor and as liquidated damage."

The distinction between a contract such as we have here under consideration and a lease, where the rent is payable with a portion of the crop, must not be lost sight of. Where the land is leased for part of the crop to be raised on it, the contract, when the lessor has placed the lessee in possession, has been executed by the former, and his right to his portion of the crop is due and will be payable when it is ready for delivery. In the meantime he and the tenant hold the crop as co-owners, or cotenants.

In a case, such as this, of the sale of land upon contract containing an agreement that a portion of the crops to be raised thereon shall be delivered to the vendor to be sold, the proceeds to be applied toward the payment of the purchase price and the amount of the payment to be determined and applied when the crops are disposed of, the contract does not vest in the vendor of the land title to the crops, or any portion thereof. (*First Nat. Bank v. Andreas,* 92 Cal. App. 62, 267 Pac. 937; *Lynch v. Sprague Roller Mills,* 51 Wash. 535, 99 Pac. 578; *Moen v. Lillestal,* 5 N. D. 327, 65 N. W. 694.) Such a contract is wholly executory, and the vendor and purchaser of the land do not hold the crops as co-owners, or cotenants, they are the property of the purchaser.

In *First Nat. Bank v. Andreas,* above cited, the court said:

"From the beginning, the courts have held that the position of a vendor where the purchaser is in possession under the contract is 'analogous to that of a mortgage.'"

The court further said:

"In its general effect, the rule is that until foreclosure, the mortgage creates no estate in the mortgagee and the mortgagor is entitled to such an absolute right and dominion over the crops that a crop mortgage executed by him to a third party takes precedence over any terms in the original mortgage seeking to give a prior security on the crops to the mortgagee. 'A purchaser let into possession has, it is said, the same general rights with respect to crops raised by him as a mortgagor would have, and so long as there

has been no default on his part or he is permitted to remain in the possession, the crops raised and harvested belong to him.' ''

In a case such as this the ownership of the land, by its purchaser, is dependent upon his delivery of the crops to the vendor to be sold in order that the proceeds may be applied according to the terms of the contract. The vendor never acquires ownership in the crops, but only a right to possession thereof in order that they may be sold and the proceeds so applied.

One who carefully reads this contract will observe that it does not vest title in appellant to the alfalfa and clover seed to be raised, but does expressly provide that:

"The proceeds from the sale of the grain and other crops so turned over to the party of the first part shall be applied, first, to the payment of interest; and second, to the payment of the principal."

Title to the seed may be determined by ascertaining to whose use and benefit the proceeds of the sale thereof is to be applied. If the money arising from the sale had been made applicable to the payment of a debt of appellant, it might well be determined that it owned the seed. Since this money was, under the contract, applicable to the payment of McCloud's obligation, being the purchase price of the land he had contracted to acquire, the seed was his property which he had contracted should be sold to the end that the money arising therefrom be paid to appellant upon the purchase price of the land.

In construing this contract it is important to ascertain what construction the parties themselves have placed upon it. (13 C. J. 546, sec. 517.) The undisputed facts, as disclosed by the record, are that the crops in 1927, 1928 and 1929 were harvested and, with the exeception of one load of alfalfa seed, were sold by McCloud. In those years he applied upon the contract the portion of the proceeds which it is provided therein should be so applied, and some money in addition thereto. With respect to one load of seed, the witness Cady, an agent of appellant, testified that in March,

1930, he went to the place of business in Buhl of respondents, Shields and Gannon, and found that for the year 1929 McCloud had stored one load of alfalfa seed in the name of the Federal Land Bank. The only credit given on the contract in 1929 is for $1,169.27, and is dated December 2d of that year. Since the load of alfalfa seed was still in the warehouse in March, 1930, it is apparent McCloud never got credit for it, and that every payment appellant received and credited on the contract was made in money and not by a division and delivery of crops, and there is no evidence that it ever objected to, or protested because of, this method of carrying out the contract.

Under date September 15, 1930, R. E. Shepherd, chairman of the board of directors of appellant corporation, wrote a letter to McCloud, a copy of which was introduced in evidence as plaintiff's Exhibit "D." It appears from the letter that McCloud had applied for permission to sell three 80-acre tracts of the land he had contracted to purchase from the bank, and with the proceeds thereof to pay off his entire indebtedness to the bank and thereby retain one 80-acre tract clear. Reference is made in Exhibit "D" to the fact that it had become necessary for appellant to borrow money and had turned over to a commission all its real estate, including that which it had contracted to sell to McCloud, to secure the repayment thereof and that one Newcomb had been placed in charge of it. Mr. Shepherd stated in his letter:

"The best I could get Mr. Newcomb to agree to was that if the proceeds from one-half of this year's crop are paid over to the commission according to the terms of the contract, and if the money advanced for maintenance is repaid, and the unpaid taxes are squared up to date, he would then be willing that such part of the land be sold by you at prices and upon terms to be approved by him, and the proceeds of the sale turned over to him as received; he would hold these sale papers as collateral to your contract, and when paid out the remainder of the land would be conveyed to you. In other words, if three of the eighties can

be sold as we have thought they might be, for sufficient to pay off the debt, then you would have the eighty across the road from your house clear.''

Mr. Shepherd's statement that ''if the proceeds from one-half of this year's crop are paid over to the commission according to the terms of the contract'' undoubtedly refers to the contract between McCloud and appellant, and his letter clearly expresses his understanding as to who had title to, and right to sell, the crops and as to whether it was crops or money, the proceeds thereof, which was to be applied toward payment for the land.

Under date October 26, 1930, the Federal Land Bank wrote a letter to McCloud, a copy of which was introduced in evidence as plaintiff's Exhibit ''C.'' In that letter it is stated:

''Under the terms of your contract it is now in order for us to apply the receipts for one-half of the 1930 crop as sold and divide the remaining sum due, above $9000.00, into two notes to be covered by crop mortgages due October 15, 1931 and 1932 respectively.

''Kindly examine your contract and see if this is not right.''

That letter also refers to the contract between McCloud and appellant and clearly shows the bank's understanding of what was to be applied upon the purchase price of the land, and that it was money derived from the sale of a portion of the crops and not a portion of the crops themselves. Up to that time no objection had been made to the crops being sold by McCloud, the trouble started when he refused to apply the proceeds toward the payment of the purchase price of the land, but instead of doing so applied it toward the payment of his debts to others, incurred in operating the land.

The record also shows, and there is no dispute about it, that the grain (wheat and corn) produced in 1930 on the land described in the contract was sold by McCloud and the money derived from it was turned over to appellant,

and appellant accepted it without complaint or contention that the contract had been violated by failure to deliver the grain.

The contract itself stated, clearly, that it was the proceeds of the sale of crops, and not the crops themselves, which were to be applied toward the purchase price of the land. It was therein recited:

"The proceeds from the sale of the grain and other crops so turned over to the party of the first part shall be applied, first, to the payment of interest; and second, to the payment of the principal."

It is true the contract provided that a portion of the crops which, at the time it was entered into, was not in existence should be turned over by McCloud to appellant, but it is also true that this was only for the purpose of having the proceeds thereof applied, not to the use and benefit of appellant, nor as appellant might elect to do with its own property, but toward the payment of the purchase price of the land which it had contracted to sell to him and which he had contracted to purchase. These circumstances make it clear that the contract was wholly executory, and that the rule which this court quoted with approval from 23 R. C. L., p. 1251, and followed in *Bertleson v. Van Deusen Brothers Co.*, 37 Ida. 199, 217 Pac. 983, 984, is controlling. It is as follows:

"When the sale is executory, if the seller refuses to deliver at the appointed time it is very clear the buyer can maintain neither trespass nor trover for the property contracted to be delivered, though the seller may then have it in his possession, and afterward sell it to someone else. Not having actual possession nor any legal title conferring right of immediate possession, he can maintain neither of these actions. His remedy is by an action on the contract itself, for a breach in refusing to deliver according to its terms."

The majority of this court is unable to distinguish between a lease where the rental is payable by a share of the crops and the contract here under consideration so far as

it affects the ownership of the crops, and appears to have been confused, to some extent, by the following fragment of an opinion which it has quoted from the supreme court of Washington in *Lynch v. Sprague Roller Mills,* above cited, namely:

" . . . . the construction which courts have uniformly placed on contracts between landlord and tenant is a safe rule to follow in construing similar contracts between vendor and purchaser."

The author of the majority opinion could not have quoted more than he did from that case without pointing the way to a correct decision of this one. · The following is what the supreme court of Washington said on the subject:

"It is an elementary rule of law that the occupier of land is the owner of all crops harvested during the term of his occupancy, whether the occupant be a purchaser in possession, a tenant in possession, or a mere trespasser in possession holding adversely. (Citing authorities.) It follows, therefore, that any claim or interest the respondents may have had in the crop in controversy arose out of the contract of sale, the material parts of which we have already set forth. That contract simply provided that the principal and interest to become due on the purchase price of the land should be paid out of the proceeds of the sale of the crops, and that the respondents and the purchasers of the land should jointly designate the warehouse or station where the wheat should be stored, and the time when the wheat should be sold. These provisions in our opinion fall far short of vesting in the respondents any right or title in the crops. There may be no direct analogy between the relation of landlord and vendor, but, independent of statute, the rights of either in crops grown on the land which is the subject of the sale or lease are dependent on contract, and the construction which courts have uniformly placed on contracts between landlord and tenant is a safe rule to follow in construing similar contracts between vendor and purchaser. The general rule on this subject as between landlord and tenant is thus stated: 'The title to the crops

raised by one man on another man's farm depends largely, if not entirely, upon the contract between the two men. If the contract amounts to a lease or demise of the land by the owner to the occupier, then clearly the crops belong to the occupier whether he pay rent in money, or in kind by a share of the crops. The occupier in such case becomes the owner *pro hac vice,* and has title to the products of the farm until division.' (Citing authorities.) See, also, *Moen v. Lillestal,* 5 N. D. 327, 65 N. W. 694, where a very similar contract was construed, and held not to confer any right in the crops upon the vendor. But cases might be multiplied holding that contracts far more favorable to the contention of the landowner than is the contract in suit were insufficient to vest in such landowner any title or interest in crops garnered by another.''

Whereupon, the supreme court of Washington reversed the trial court because it had decided the question the same as the majority of this court has done.

Appellant contends that, in any event, it is entitled to judgment against McCloud for damages in the amount of the value of the crops he failed to deliver pursuant to the contract, under the provisions of our statute, sec. 7–704, to the effect that the court may grant a plaintiff any relief consistent with the case made by the complaint embraced within the issues.

Appellant is not entitled to judgment against McCloud for damages in the amount of the value of the crops he failed to deliver, because delivery of the crops was due only as a payment upon the contract to purchase the land, and they were to be sold and the proceeds applied to the purchase price of the land. The crops were not delivered and no interest in the land, because of them, was neither acquired by McCloud nor lost by appellant.

There is no evidence in the record to show what damage, if any, appellant has suffered by reason of McCloud's breach of the contract.

The judgment should be affirmed.