(No. 6589.  December 31, 1938.)

P. W. MITCHELL, Respondent, v. MUNN WAREHOUSE COMPANY, a Corporation, M. B. MIKKELSON, C. E. MUNN and WILEY WAGNER, Individually and as Co-partners and as Directors of Said Corporation, HARTFORD ACCIDENT AND INDEMNITY COMPANY, a Corporation, and BOYD–CONLEE COMPANY, a Corporation, Appellants.

[86 Pac. (2d) 174.]

662

Cox, Ware & Stellmon, for Appellants M. B. Mikkelson, C. E. Munn, and Wiley Wagner as Directors and Trustees of the Munn Warehouse Company, a Corporation, and Hartford Accident & Indemnity Company, a Corporation.

664

A. S. Hardy, for Appellant Boyd-Conlee Company, a Corporation.

Wilbur L. Campbell, for Respondent.

HOLDEN, C. J.—Prior to October 25, 1931, M. B. Mikkelson, C. E. Munn, and Wiley Wagner were engaged as copartners in the operation of a warehouse at Craigmont, Idaho,

under the firm name of Munn Warehouse Company. On or about October 25, 1931, the co-partnership incorporated. Thereafter, and until on or about May 25, 1933, the corporation operated the warehouse under a license issued by the department of agriculture. September 16, 1932, appellant Hartford Accident and Indemnity Company became surety for such corporation, as provided by Title 67, chap. 2, I. C. A. In the following October respondent Mitchell stored in the warehouse of such company 13,024 bushels of wheat of three varieties, namely, Federation, Ridit, a red wheat, and Albit, a white wheat. The wheat was delivered to the warehouse in sacks. May 25, 1933, there were approximately 2,445 sacks, or 5,105 bushels of the Albit wheat in the warehouse. These sacks were in a separate or special pile and upon many of them the name "P. W. Mitchell" was painted. Approximately 60 per cent. of the grain in the elevator and warehouse was insured and 40 per cent. uninsured, including the Mitchell grain.

A fire was discovered in the warehouse in the early morning hours of Thursday, May 25, 1933. The manager of the warehouse immediately purchased equipment and employed a crew to fight the fire and salvage the grain. A Mr. Lyng, an insurance adjuster, arrived at the scene of the fire about noon Friday, and Mr. Boyd, of Boyd-Conlee Company, arrived on Saturday, a little before noon. After Lyng arrived, Munn, the manager of the warehouse, surrendered the work of salvaging the grain and Lyng took over the work. On arriving at Craigmont, Boyd went to the scene of the fire and contacted Lyng, after which Lyng went to the manager of the warehouse company and told him of an offer on the grain he had from Boyd. The manager told Lyng he did not think the offer was enough and then Lyng asked the manager if he knew of any other purchasers who might be interested. The manager told him he did not but he would go to the telephone office and see if he could find someone. The manager immediately went to the telephone office (between 5 and 6 o'clock in the evening), called Lewiston, and talked to a Mr. Wright and a Mr. Mikkelson about the grain, asking them if they were interested in buying it, or if they knew of anyone who might be interested in buying it. They told

the manager they would be up the next morning, but when the manager returned Lyng told him he had sold the grain to Boyd. It is not clear from the record just when respondent arrived at the scene of the fire. At any rate, the second day after the fire started, respondent asked Lyng ''what authority he had to sell my grain and he told me: 'This is the way we have been doing; the way we handle this.' And I said: 'Well, I would like to know where you have any right to take somebody else's grain and sell it without their authority.' 'Well,' he says, 'That is the custom.' 'Well,' I says, 'this is one time when you are not going to get by with it.' '' Respondent Mitchell did not assent to the sale of his grain nor did the purchaser, appellant Boyd-Conlee Company, either pay, or offer to pay, Mitchell anything whatever for his grain until after this action was commenced.

May 21, 1936, respondent commenced an action in conversion in the district court for Lewis county against the Munn Warehouse Company, a corporation, M. B. Mikkelson, C. E. Munn, and Wiley Wagner, individually, and as directors of the corporation, Hartford Accident and Indemnity Company, Boyd-Conlee Company, and General Insurance Company of America. Thereafter, a judgment of dismissal was entered as to the General Insurance Company.

The complaint charged, in the usual form, the conversion of respondent's wheat. In addition, it alleged that Mikkelson, Munn, and Wagner, prior to the incorporation of the Munn Warehouse Company, were co-partners, and, as such, engaged in the operation of a warehouse at Craigmont, Idaho; that such co-partnership was incorporated under the laws of Idaho on or about October 25, 1931, and that the corporation operated the warehouse under a license until on or about May 25, 1933; that the Munn Warehouse Company had forfeited its charter and that Mikkelson, Munn, and Wagner were its reputed directors, officers, and agents, and were joined as such under the provisions of sec. 29–611, I. C. A.; that on or about the 4th day of September, 1931, as provided by Title 67, chap. 2, I. C. A., appellant Hartford Accident and Indemnity Company became surety for Mikkelson, Munn, and Wagner, as co-partners in obtaining a license to conduct a warehouse at Craigmont; that on or about September 16, 1932, as pro-

vided by Title 67, chap. 2, I. C. A., appellant Hartford Accident and Indemnity Company became surety for the Munn Warehouse Company, a corporation, in obtaining a license to conduct a warehouse business at Craigmont.

Appellant Boyd-Conlee Company answered, denying the alleged conversion of respondent's wheat, and, as an affirmative defense, alleged that on or about May 26, 1933, it was notified by Lyng, insurance adjuster for certain insurance companies having insurance on the Munn warehouse at Craigmont, the warehouse had burned and it was asked if it would make a bid on the grain; that, thereupon, Boyd, president of the company, proceeded to Craigmont, arriving there on the morning of May 27, 1933; that at that time the grain in the warehouse was all commingled together and portions thereof were burning at the time Boyd arrived; that none of the grain was marked in any way so it could be identified; that Lyng sold the grain to it for the sum of $1,500; on information and belief, it alleged that respondent was fully informed of the fact Lyng had sold the grain and made no objection to the sale to either Lyng or to it; that it was impossible to identify any particular wheat in the warehouse at the time the grain was purchased and that the price paid for the grain was the full value of such grain; that plaintiff was estopped from making any claim against it by reason of his said conduct.

Mikkelson, Munn, Wagner, and appellant Hartford Accident and Indemnity Company also answered, denying the alleged conversion of respondent's wheat; the company admitted that on or about September 16, 1932, it became surety for the Munn Warehouse Company in obtaining a license to conduct its warehouse at Craigmont, Idaho, and issued a bond in the penal sum of $4,000. As an affirmative defense, it alleged the destruction of the warehouse by fire and "that any and all grain therein contained, piled in special piles, or otherwise, and marked and identified as the particular property of a particular person, or otherwise, was so damaged, burned and destroyed by fire and the sacks containing any such wheat in said warehouse were so damaged and burned, by or as a result of said fire, and the contents thereof were commingled with other grain in said warehouse in such a

manner, by or as a result of said fire, that it was impossible to ascertain or segregate the grain of any particular person from that of any other particular person; that this answering defendant is informed and believes, and upon information and belief alleges that one H. C. Lyng, acting in behalf of certain insurers of some of the grain in said warehouse (whose names are to defendant unknown), took possession of and caused such damaged grain as survived said fire to be sold; and that said H. C. Lyng in conducting the sale of said grain did not do so as the agent of this defendant, or with defendant's knowledge, acquiescence or consent; that this defendant is informed and believes and on information and belief alleges, that the said H. C. Lyng sold said grain with the full knowledge, acquiescence and consent of the plaintiff herein, and that said H. C. Lyng holds the proceeds of said sale for the benefit of the plaintiff and any and all persons having any interest in said grain.''

June 15, 1937, the case was tried to the court sitting without a jury. September 24, 1937, the court made and entered findings of fact and conclusions of law and, on the same day, entered judgment thereon in favor of respondent and against appellants in the sum of $1,377, from which Mikkelson, Munn, Wagner, and the Hartford Accident and Indemnity Company prosecute a joint appeal and the Boyd-Conlee Company a separate appeal.

While Mikkelson, Munn, Wagner, and the Hartford Accident and Indemnity Company prosecuted a joint appeal, and the Boyd-Conlee Company a separate appeal, they all contend: 1. That respondent's grain was so commingled with other grain it was impossible to identify the grain of one depositor from that of another. 2. That respondent's wheat was in imminent danger of destruction and in such an emergency a sale of the wheat as part of salvaging operations was justified. 3. That the sale of respondent's grain by Lyng was with the knowledge, acquiescence, and consent of the respondent and, therefore, respondent is estopped. These contentions will be discussed in the order above stated.

The trial court found that during the Fall of the year 1932 respondent delivered to the warehouse 10,792 bushels of wheat, of which 5,073 bushels were red wheat and 5,719

bushels were Albit, or white wheat; that all of the wheat was delivered to the warehouse in sacks and piled in special piles, being separate and distinct from other wheat stored in the warehouse; that said piles were distinctly marked and identified with respondent's name; that the Albit, or white wheat, in the amount of 5,700 bushels remained in the warehouse in a special pile marked and identified with the name of the respondent, P. W. Mitchell, and was not commingled, mixed or confused with the grain of any other person; and that after the fire, the grain of respondent remained "in a separate and identified pile marked with and identified by the name of P. W. Mitchell, the plaintiff, and that a part of the sacks on the top and edges of the pile were burned, bursted and split open, and that 600 bushels thereof was destroyed," but that the remainder of the pile remained intact and was not commingled, confused, or mixed with the grain of any other person.

While there is some conflict, there is ample substantial evidence supporting these findings. In effect, and with great candor, appellant Boyd-Conlee Company so admits in the following language: "A considerable portion of the testimony in this case was given over to conflicting views as to whether plaintiff's wheat was separately piled so as to be distinguishable from a mass in the warehouse both before and after the fire. While not agreeing with the court's conclusion in this regard, it is conceded as set forth in the statement of facts that there was testimony produced to support a finding that plaintiff's wheat was distinguishable both before the fire and in a lesser quantity after the fire." This court has held repeatedly that where, as here, there is substantial conflict in the evidence, the decision of the court and judgment thereon will not be disturbed. (*Largilliere Co., Bankers, v. Caribou County*, 56 Ida. 716, 721, 58 Pac. (2d) 466), and cases therein cited.

In support of the second contention, appellants cite and rely upon section 171, 67 C. J., page 538, reading as follows:

"It seems that if there is imminent danger of damage to, or destruction of, the goods, the warehouseman may sell even without notice to the depositor, although where the danger of damage or destruction is not imminent the warehouseman

will be held liable for conversion if he sells without notice to his depositor.''

Corpus Juris rests its statement of that rule upon *Jordan and Another v. Shireman,* 28 Ind. 136. In January, 1865, Shireman deposited wheat in a warehouse operated by Jordan and Spotts. In July following, the warehousemen sold the wheat, without notice to Shireman, claiming it was necessary to prevent its destruction by weevil. Shireman lived in an adjoining county but the court said he had visited the warehouse of defendants in June and that they had abundant opportunity of knowing his postoffice address, and ''the wheat was placed in a bin upstairs, and although there is proof that weevil were in the warehouse, and that white wheat was most liable to attack from them, there is no proof that weevil were in this particular lot. Rusch, a warehouseman at Indianapolis, swears that 'weevil that season got into a bin of wheat in his warehouse, that he moved the wheat, cleared out the bin, white-washed it, and cleared up the warehouse, and had no more trouble with it.' '' In the Shireman case, it appears the wheat was not in imminent danger of destruction in that, first, weevil had not gotten into the Shireman wheat, and, secondly, even though weevil had gotten into the wheat, the wheat could have been moved, the bin white-washed, and the warehousemen would have ''had no more trouble with it.'' Furthermore, in that case, ''the defense was, that in July, 1865, the defendants sold the wheat, without notice to the plaintiff, to prevent its destruction by weevil.'' In the case at bar, appellants did not plead in the court below, as Jordan and Spotts pleaded in the trial court in the Shireman case, *supra,* that respondent's wheat was sold, without notice to him, to prevent its destruction, nor did appellants plead that such wheat was in imminent danger of destruction. Therefore, the trial court had no opportunity to, and did not, pass upon that question. Having failed to plead that defense in the court below, it cannot be tried for the first time on appeal. This is not a trial court.

As to the third contention: The trial court found Lyng did not sell the Mitchell grain with Mitchell's knowledge, asquiescence or consent, and that respondent did not have knowledge such grain was sold to appellant Boyd-Conlee

Company until after it was sold, and those findings are also amply supported by substantial evidence. Indeed, the record shows Lyng himself testified he sold respondent's wheat after he knew the wheat belonged to respondent and after Mitchell had spoken to him about the matter. Lyng further testified he did not consult with respondent at the time he sold the wheat. Instead of acquiescing in, or consenting to, the sale, the record shows respondent told Lyng he had no right or authority to sell his wheat. It follows respondent did not consent to, nor acquiesce in, the sale of his wheat and therefore is not estopped.

Appellant Boyd-Conlee Company contends the trial court erred in finding the value of respondent's wheat to be 27¢ per bushel at the time of the conversion. It is true the only evidence of the value of respondent's grain immediately after the fire, other than the testimony of Boyd as to the value of No. 1 salvage, was the evidence of the price Boyd paid Lyng for it. While there is evidence that Albit, or white wheat, at the time of the alleged conversion, was selling for around 33¢, as one witness fixed the price, and around 38¢, as fixed by another witness, that was the price of Albit wheat undamaged by fire or smoke. As to the price of the wheat which had passed through the fire, Boyd testified wheat in bags that was not intermingled with charred berries or anything of that kind, "but did have a smoke odor, a creosote odor, we would call that a No. 1 salvage." Boyd also testified he shipped two cars of No. 1 salvage for which he received $9 a ton, f.o.b. cars at Craigmont. Following that testimony, the record shows:

"The COURT: Now, just one more question. If you would convert that nine dollar figure that you got for that No. 1 salvage into bushels, I would appreciate it.

"A. (BOYD.) It would be 27¢ a bushel."

The trial court found, and correctly we think, that respondent's wheat at the time of its conversion was of the value of 27¢ a bushel, or the total sum of $1,377, in that, where property has no market value, what it sold for in a *bona fide* transaction, is relevant to prove its value. (*Humphreys v. Minnesota Clay Company,* 94 Minn. 469, 103 N. W. 338, 2 Jones Commentaries on Evidence, p. 1318, sec. 703.) And

while there is some authority to the contrary, the prevailing doctrine is that evidence of the price obtained at a private sale is admissible on the question of the value of the goods. (65 C. J., pp. 109, 110, sec. 195.) Surely, if there was any wheat in the warehouse entitled to be graded No. 1 salvage and, therefore, worth 27¢ per bushel, it was respondent's in that there is no evidence in the record of any wheat being smoked or damaged less than Mitchell's.

It is further contended by appellant, Boyd-Conlee Company, that the court erred in not deducting nine cents per bushel (average cost per bushel of the salvaging operations) from the amount of damages awarded to the respondent. Appellant did not seek a recovery of that expense by its answer in the court below. Its recovery was not made an issue, consequently, the trial court was not given an opportunity to pass on that question and made no finding thereon. The recovery of that expense cannot be raised for the first time on appeal.

It is further contended by appellant Boyd-Conlee Company that respondent is estopped from claiming conversion in that respondent did not assist in the salvaging operations and did not seek out Mr. Boyd or any other representative of the Boyd-Conlee Company to object or request any special treatment with respect to his wheat. To say the least, respondent was under no greater duty "to seek out" Mr. Boyd than Boyd was "to seek out" the respondent, and, further, the facts, as disclosed by the record, are, that respondent did not know Lyng had sold the wheat to Boyd until after the sale. It could hardly be argued that respondent was under any duty to assist Boyd in salvaging operations prosecuted for the purpose, among other, of converting respondent's wheat to the use of appellant Boyd-Conlee Company.

Appellant Boyd-Conlee Company also contends the trial court erred in failing to find "that Plaintiff's grain was in danger of destruction under the circumstances existing in this case and that it was the duty and right of the Warehouse Company and of Lyng, representing the insurance companies, to salvage the grain." First, and as hereinbefore pointed out, appellants did not plead the grain was in danger

674

of destruction. Secondly, the record does not show appellants requested such a finding. Having failed to plead such defense, it was not an issue. Therefore, and for the further reason appellants did not request a finding, no error was committed. (*Reid v. Keator*, 55 Ida. 172, 39 Pac. (2d) 926.)

It is contended by appellants Mikkelson, Munn, Wagner, and Hartford Accident and Indemnity Company the court erred "in finding that the bond furnished by the appellant, Hartford Accident and Indemnity Company for M. B. Mikkelson, C. E. Munn and Wiley Wagner, as co-partners, was in effect at the time the respondent's grain was stored in the warehouse at Craigmont for the reason that there is no evidence to show the existence of such bond and the undisputed evidence shows the existence only of the bond referred to in finding Number 3, which covered the period from June 30, 1932, to June 30, 1933, and that none of the respondent's grain was deposited during the term of the bond referred to in finding Number 2." It is true there is no evidence of the existence of the bond furnished by the indemnity company to the co-partnership, but the error is harmless in that the bond furnished by the company to the Munn Warehouse Company, a corporation, was in full force and effect at the time of the conversion of respondent's grain, and the company is liable to respondent under that bond because the conversion of the wheat was a breach of the bond. It may be added that even though it had been proven the indemnity company furnished a bond to the co-partnership, there would be no liability under it in that the conversion did not occur during the period it was in force.

It is also contended by the last above-named appellants that the court erred in finding Lyng sold respondent's grain to Boyd-Conlee Company without his knowledge or consent, and in finding the sale was made with the knowledge and consent of the warehouse company. While the record shows Lyng sold the wheat to Boyd-Conlee Company while Munn (the manager of the warehouse company) was phoning to Lewiston, there is no evidence that Munn protested or took any steps whatever to prevent the consummation of the sale. It is true that Munn told Lyng, before he went to the phone, that he did not think the offer of the Boyd-Conlee Company

was enough, but after his return, upon being advised of the sale, he did not make any protest. Consequently, there is no merit in the contention.

It is further contended by appellants Mikkelson, Munn, Wagner, and Hartford Accident and Indemnity Company that a judgment cannot be entered against the Munn Warehouse Company in that the company had forfeited its charter. Sec. 29-611, I. C. A., provides:

"*Trustees for defaulting corporation and stockholders.*—In all cases of forfeiture under the provisions of this chapter, the directors or managers in office of the affairs of any domestic corporation whose charter may be so forfeited, or of any foreign corporation whose right to do business in this state may be so forfeited, or any other person or persons who may be appointed by any court of competent jurisdiction to perform that duty, are deemed to be trustees of the corporation and stockholders or members of the corporation whose power or right to do business is forfeited, and have full power to settle the affairs of the corporation, and to maintain or defend any action or proceeding then pending, in behalf of or against any of said corporations, or to take such legal proceedings as may be necessary to fully settle the affairs of said corporation, and such directors or managers, as such trustees, may be sued in any of the courts of this state after such forfeiture by any person having a claim against any of the said corporations.''

It will be noted the statute expressly provides that "*such directors or managers, as such trustees, may be sued in any of the courts* of this state after such forfeiture by any person having a claim against any of said corporations.'' In the case at bar, respondent alleged in his complaint that the warehouse company had forfeited its charter and that Mikkelson, Munn, and Wagner were its reputed directors, officers, and agents and that they were joined as such under the provisions of the above-quoted statute. Respondent had, and pleaded, a claim against the warehouse company for the conversion of his grain and very properly made the directors (who are made trustees of the warehouse company by such statute) party defendants. The contention is without merit.

The unauthorized sale and delivery of respondent's

wheat with the acquiescence of the warehouse company permanently deprived respondent of his property. This court held in *Forbush v. San Diego Fruit etc. Co.*, 46 Ida. 231, 243, 266 Pac. 659, that any unauthorized act which deprives an owner of his property permanently or for an indefinite time is a conversion. And, as to appellant Boyd-Conlee Company, the record shows it purchased respondent's wheat from Lyng and then took possession of, and sold, the same. We held in *Federal Land Bank v. McCloud*, 52 Ida. 694, 703, 20 Pac. (2d) 201, that one buying personal property must, at his peril, ascertain the ownership, and if he buys from one without authority to sell, his taking possession constitutes conversion.

The judgment should be affirmed. Costs awarded to respondent.

Morgan, J., concurs.

GIVENS, J.— I concur in the opinion of Holden, C. J., except as to the amount of recovery. As to the amount of recovery I concur in his opinion to the effect that the only evidence of the market value of respondent's wheat at the time of the conversion thereof was that for which the wheat was thereafter sold. The evidence conclusively shows, however, that the top sale price of $9 a ton, or 27 cents per bushel, and therefore, under the above statement of law the top market value, did not apply to all of the wheat in the warehouse, hence not to all of respondent's wheat, because the evidence shows no grain was sold as undamaged wheat, and but three car loads of all the salvaged wheat were sold as Salvage No. 1 at the top price, or thereby had a market value as No. 1 salvage of $9 a ton or 27 cents per bushel. Applying the above rule and conceding respondent's grain was damaged the least of any grain in the warehouse, respondent would be entitled to only the top sale, or considered market value, at which the wheat was actually sold (*Unfried v. Libert*, 20 Ida. 708, 726, 727, 119 Pac. 885) namely, as shown by a tabulation of the car loadings and prices received therefor, car No. 13566 containing 76,612 pounds or 1277 bushels (60 pounds per bushel, sec. 69–208, I. C. A.) at $9 a ton or .27

cents per bushel, $344.79; car No. 40433 of 70,584 pounds or 1176 bushels $317.52; car No. 46742, 75,875 pounds or 1264 bushels, $340.88; car No. 28618, 81,430 pounds or 1357 bushels at $8 per ton or .24 cents per bushel, $325.68; leaving 27 bushels in car No. 43372 at $6.70 per ton or .20 cents per bushel, $5.40, amounting to a total of $1334.27 for 5100 bushels, with interest at 6 per cent. from May 27, 1933, amounting to $346.20, thus totaling $1680.47 principal and interest, for which amount with costs in the district court of $129.25, the judgment is affirmed.

Costs herein awarded to respondent.

Ailshie and Budge, JJ., concur with Givens, J.