561 P.2d 1299

Lyle SMITH and Shayne Linderman, Plaintiffs-Respondents (# 11936, # 11937), Plaintiffs-Appellants (# 11938),

v.

GREAT BASIN GRAIN CO., a corporation, and R. Kent Heileson, Individually and as Statutory Trustee, Defendants-Appellants (# 11936), Defendants-Respondents (# 11937, # 11938),

and

Millers National Insurance Company of Illinois, a corporation, Defendant-Appellant (# 11937), Defendant-Respondent (# 11936, # 11938),

and

Ralph A. Heileson et al., Defendants-Respondents (# 11936, # 11937, # 11938).

No. 11936–11938.

Supreme Court of Idaho.

March 9, 1977.

Mary Smith and J. D. Hancock, Smith & Hancock, Rexburg, for appellants and respondents Lyle Smith and Shayne Linderman.

Larry M. Boyle, Hansen & Boyle, Idaho Falls, for respondents and appellants Great Basin Grain Co. and R. Kent Heileson.

Robert J. Fanning, Fanning & Woolf, Idaho Falls, for respondent and appellant Millers National Insurance Company of Illinois.

W. Lynn Hossner, Ashton, for respondent Ralph A. Heileson.

W. Brent Eames, Jolley & Eames, Rexburg, for respondents Allan E. Mecham and Craig W. Mecham.

SCOGGIN, District Judge (retired).

These three appeals, consolidated for decision here, arose from separate actions

brought by Lyle Smith and Shayne Linderman, two grain farmers, against a warehouse corporation, its directors and purported statutory trustees, and its surety for an alleged conversion of grain placed in storage. Following special jury verdicts finding for the plaintiff farmers and entry of judgment, the district court granted the defendants' motions for a new trial unless the plaintiffs would accept remittiturs. Plaintiffs refused the remittiturs. The district court then entered an order for a new trial. These appeals followed, challenging various rulings and orders made below. For the reasons discussed herein, we affirm the order granting a new trial and remand the cases for further proceedings.

## I.

Lyle Smith and Shayne Linderman are grain farmers in Teton County. In 1970, between May 5 and July 31, Lyle Smith (hereinafter Smith) "stored" with Great Basin Grain Co. (hereinafter Great Basin) wheat and barley which had a total value of $56,870.34. The storage of this grain was evidenced by non-negotiable warehouse receipts issued by Great Basin over R. Kent Heileson's (hereinafter Kent Heileson) signature. These receipts bear along the left-hand margin the label "grain settlement." All the receipts indicate a scale ticket number, a delivery date and a gross, tare and net weight. The receipts for the wheat "stored" also show figures on the test, grade and protein quality of the grain. The receipts in the record show a price per bushel or hundredweight and a total value for the grain represented by the receipt at the price listed.

Checks from Great Basin payable to Smith show that he received a total of $41,915.00 in payment, described on Great Basin's statements of remittance advice attached to the checks as "advance[s] on grain." Smith claimed, and the special jury verdict awarded, only $10,431.04. "Off-setting" charges of $4,524.30 for other services by Great Basin make up the difference.

Shayne Linderman's (hereinafter Linderman) claim in his case arose out of two distinct sets of transactions. The first involves wheat (60,103 lbs.) and barley (20,870 lbs.) "stored" with Great Basin in the fall of 1968, which Linderman claimed had a total value of $1,820.22. There are no checks in evidence which relate to this grain.

The second Linderman transaction involves 610,957 pounds of spring wheat, valued at $18,158.36. This wheat was apparently stored in Linderman's personal elevators in Tetonia, located near Great Basin's elevators. In August of 1970 Great Basin loaded that wheat onto railroad cars. Great Basin issued one of its non-negotiable warehouse receipts for this wheat. In addition, however, this receipt lists Union Pacific railroad car numbers instead of scale ticket numbers and printed at the top of the receipt are the words "contract # 85." In evidence is a document bearing Great Basin's letterhead, addressed to "Shane [sic] Linderman," which recites, "We confirm purchase from, or sale to you of . . . ." The words "purchase from" are circled. The document is numbered "85." The total of Linderman's claim in this case, and the amount awarded by the special jury verdict is $19,978.58. The proper legal characterization of the transactions behind these figures and receipts is the heart of the disputes in these cases.

Great Basin was incorporated in April of 1968 as an Idaho corporation by the defendants Kent Heileson, Ralph A. Heileson, Craig W. Mecham, and Allan E. Mecham. They were Great Basin's sole stockholders, directors and officers. Great Basin took over the business of Colorado Milling and Elevator which had been managed for many years by Ralph Heileson, Kent Heileson's father. Great Basin leased the property, buildings and equipment it operated from a Utah investment partnership, owned by Kent Heileson and Craig Mecham, which bought them from Colorado Milling and Elevator. Kent Heileson was the resident manager of Great Basin, apparently assisted by his father Ralph Heileson. The officers and directors of Great Basin were required to be stockholders.

Great Basin operated as a corporation until November 30, 1970, when the Idaho Secretary of State ordered its corporate charter forfeited for failure to file a 1970 annual statement. It is disputed whether Allan Mecham effectively resigned as a director in 1969; whether Craig Mecham effectively resigned as an officer and director in the spring of 1970; and, whether Ralph Heileson effectively resigned as an officer and director in July of 1970. Whether these individuals were directors on November 30, 1970, and therefore statutory trustees of the defunct corporation under I.C. § 30–611, is also disputed. In addition, it is disputed whether Craig Mecham, Ralph Heileson and Allan Mecham sold their ownership interests in Great Basin.

Great Basin, or Kent Heileson acting on its behalf, allegedly filed a voluntary petition for bankruptcy on February 21, 1971. The trustee of the bankrupt's estate was discharged, and the estate was closed, in December of 1973. A formal discharge of Great Basin as a bankrupt was apparently not obtained. Smith and Linderman were named as unsecured creditors in the bankrupt's schedule of creditors, but never filed a claim in the bankruptcy proceedings. These actions were filed in December of 1971, following demand upon the surety Millers National Insurance Company of Illinois (hereinafter Millers).

Great Basin operated its grain warehouse and elevators as a bonded warehouse, licensed under state law by the department of agriculture. Title 69, Ch. 2, "Bonded Warehouse Law," Idaho Code; I.C. § 69–203. As part of the licensing requirements of Chapter 2, an applicant for a license must execute a bond. Accordingly, Great Basin executed a Warehouseman's Bond with Millers as surety, in the amount of $24,500.00, effective May 1, 1968, until May 1, 1969, and for succeeding yearly periods unless cancelled. The bond was in force during all times pertinent to these cases. Millers was named as a defendant and alleged to be liable for a purported conversion of Smith's and Linderman's grain by Great Basin. I.C. § 69–209. The plaintiffs also claimed attorney's fees from Millers pursuant to I.C. § 41–1839.

Generally, Smith's and Linderman's amended complaints took the position that all of the grain was in "storage" with Great Basin and was converted by it. Great Basin, its directors and purported statutory trustees, and its surety contended that the grain was sold to Great Basin, that plaintiffs are merely unpaid sellers, and that they, the defendants, are therefore not liable for any conversion. The defendants especially insisted that the plaintiffs' actions on these debts were barred by Great Basin's bankruptcy.

The testimony at trial was in much conflict. Kent Heileson testified that Great Basin purchased all the grain in question from Smith and Linderman. Smith testified that his grain was originally delivered for storage and only later was it offered to Great Basin for "conditional sale." Linderman took the position that the small portion of his grain held in storage by Great Basin was never offered for sale. He also testified that the much larger amount of grain held in his own elevators was offered to Great Basin for "conditional sale" on terms like those testified to by Smith.

This was the basic evidence presented at trial. In addition, there was evidence introduced about the manner in which Great Basin as a corporation conducted its business, about the role of the individual directors in Great Basin's management, and about the circumstances of the purported resignations as directors of Ralph Heileson, Craig Mecham and Allan Mecham. Before trial the parties agreed the trial court would decide the liability of the individual defendants as directors and statutory trustees after the trial was completed. At the close of the plaintiffs' evidence, the trial court granted motions to dismiss by Ralph Heileson and Craig Mecham on their liability as directors, reserving until after trial the question of their liability as statutory trustees. The jury was then presented with special verdict forms concerned solely with

the issues whether plaintiffs' grain was stored and converted, or sold, and if stored and converted, what the extent of their damages was.

The jury's verdict with respect to Smith found that Smith stored wheat "and/or" barley with Great Basin between May 5, 1970, and July 31, 1970; that the amount of grain stored was "all" wheat and "none" barley; that Smith sold wheat "and/or" barley to Great Basin between May 5 and July 31, 1970; that the amount of grain sold was "wheat *all but* $10,431.04" and "Barley *all* "; that Great Basin converted wheat "and/or" barley belonging to Smith after May 5, 1970; and, that Smith sustained damages of $10,431.04.

With respect to Linderman the jury found that Linderman stored wheat "and/or" barley with Great Basin between September 12, 1969, and August 18, 1970; that Linderman stored 60,103 lbs. of wheat and 20,870 lbs. of barley; that Linderman did not sell wheat "and/or" barley to Great Basin between September 12, 1969, and August 18, 1970; that Great Basin converted wheat "and/or" barley belonging to Linderman after September 12, 1969; and, that Linderman sustained damages of $19,978.58.

Following the trial and the return of the jury's verdicts, the defendants moved for judgment notwithstanding the verdict or in the alternative for a new trial. The trial court denied the motion for judgment n. o. v.

In its final judgment, the trial court held that the individual defendants were not liable as statutory trustees, and that the plaintiffs were entitled to attorney's fees of $12,-500.00 from defendant Millers. Judgment on the special verdicts was entered against Great Basin, Kent Heileson and Millers, but a new trial was ordered unless the plaintiffs accepted remittiturs reducing the amounts of the judgments as set by the trial court within ten days. Plaintiffs did not accept the remittiturs, and an order for a new trial was entered. Plaintiffs, Smith and Linderman, appealed, as did defendants Great Basin, Kent Heileson and Millers. The other individual defendants appear as respondents upon the plaintiffs' appeal.

II.

APPEAL OF GREAT BASIN, KENT HEILESON AND MILLERS (NOS. 11936, 11937)

After the plaintiffs filed their complaints, all the defendants filed motions for summary judgment based upon the pleadings and the record, which included depositions and affidavits. The district court granted the motion for summary judgment made by defendant Millers on the pleadings alone and granted leave to the plaintiffs to amend their complaints. Plaintiffs amended their complaints, and defendant Millers later moved to dismiss the amended complaints which it claimed stated a new cause of action against it. Great Basin, Kent Heileson and Millers assign error to the district court's denial of Millers' motion.

■■■ The changes in the amended complaints do reflect a new legal theory of recovery against defendant Millers. There is no problem with this, however, since the basic facts giving rise to a right of recovery remain unaltered. The mandate of I.R.C.P. 15(a) is that leave to amend "shall be freely given when justice so requires". The United States Supreme Court has said that the mandate of the comparable federal rule is to be heeded. We agree with this conclusion.

"If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendment previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. —the leave sought should, as the rules require, be 'freely given.' " *Foman v.*

*Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

*See Simons v. United States*, 497 F.2d 1046, 1049 (9th Cir.1974); *Sherman v. Hallbauer*, 455 F.2d 1236, 1242 (5th Cir.1972); 3 Moore's Federal Practice ¶ 15.08[3], at 888 (2d ed. 1974). *Cf. Hessing v. Drake*, 90 Idaho 67, 71–72, 408 P.2d 180, 182–83 (1965). Great Basin, Kent Heileson and Millers have shown no reason why leave to amend should not have been granted, nor is any apparent. The cases cited above have uniformly permitted amendments to state new or alternative theories of recovery. In the absence of an abuse of discretion by the district court in granting (or denying) leave to amend, which is the case here, this Court will not disturb the ruling of the trial court.

■ Before trial the defendants moved for summary judgment or to dismiss the amended complaints on the ground that the plaintiffs' claims were barred by the bankruptcy of Great Basin. Error is assigned to the denial of those motions. We do not agree that there was error. Great Basin's trustee in bankruptcy was discharged and the estate of the bankrupt was closed. But nothing in the record even suggests that Great Basin was discharged as a bankrupt, and thus that it was released from its provable debts. Bankruptcy Act § 17, 11 U.S.C.A. § 35(a)(2) (1976 Cum.Supp.). We need not consider whether the plaintiffs' claims are "provable debts" and thus "dischargeable." Bankruptcy Act § 17, 11 U.S.C.A. § 35(c)(2) (1976 Cum.Supp.). Of course, even if Great Basin had been discharged, this would not affect the personal liability of Great Basin's directors and purported statutory trustees, or of its surety. Bankruptcy Act §§ 4, 16, 11 U.S.C.A. §§ 22(b), 34 (1953).

■ It is appropriate to note here that, upon remand, the district court should dismiss Great Basin as a party to these actions. Great Basin forfeited its corporate charter in this state in November of 1970, over a year before these actions were filed. A corporation which has forfeited its corporate charter can not be sued and judgment can not be entered against it in its corporate name. It is not properly a party. *Jolley v. Puregro Company*, 94 Idaho 702, 705, 496 P.2d 939, 942 (1972). This conclusion does not affect the personal liability of Great Basin's directors, its statutory trustees, if any, or of its surety.

■ During the course of this litigation Great Basin, Kent Heileson, Ralph Heileson and Millers made motions for summary judgment, directed verdict and judgment notwithstanding the verdict. (Defendant Millers also made a motion for judgment on the pleadings. Inasmuch as this motion was made on the basis of the pleadings and the record, it was properly treated as a motion for summary judgment. I.R.C.P. 12(c); *Cook v. Soltman*, 96 Idaho 187, 525 P.2d 969 (1974). Disposition of the issue raised by the denial of this motion is thus subsumed under our treatment of the defendants' motions for summary judgment.) All of these motions were denied by the district court. Great Basin, Kent Heileson and Millers have assigned error to the district court's denials of these motions.

■■ Summary judgment is not to be granted where there exists a genuine issue of material fact. I.R.C.P. 56(c); *Fairchild v. Olsen*, 96 Idaho 338, 339–40, 528 P.2d 900, 901–02 (1974); *Langroise v. Becker*, 96 Idaho 218, 221, 526 P.2d 178, 181 (1974). It suffices to point out that at the time these motions were made there existed a factual dispute among the parties whether the grain in question was in storage with or sold to Great Basin, whether the grain had been converted by the defendant Great Basin and its officers, whether the individual defendants were directors of Great Basin at the time of the alleged conversion, and whether the individual defendants were personally liable for the alleged conversion as directors and statutory trustees of Great Basin. On this state of the record, it was not error to deny the motions for summary judgment.

■ The defendants made their motions for a directed verdict at the close of the

plaintiffs' cases and at the end of the presentation of all the evidence. The motions for judgment n. o. v. were made after the return of the jury's special verdicts and in conjunction with an alternative motion for a new trial. In a jury case these three motions are governed by the same standard:

"On a motion for directed verdict pursuant to I.R.C.P. 50(a) or for judgment notwithstanding the verdict, pursuant to I.R.C.P. 50(b), the moving party admits the truth of the adverse evidence and every inference that may be legitimately drawn therefrom. . . . Neither motion should be granted if there is substantial evidence to justify submitting the case to the jury or to support the verdict once it has been returned." *Barlow v. International Harvester Co.*, 95 Idaho 881, 886, 522 P.2d 1102, 1107 (1974); *Mann v. Safeway Stores, Inc.*, 95 Idaho 732, 736, 518 P.2d 1194, 1198 (1974).

Applying that standard to the plaintiffs' cases-in-chief first, we hold that the district court did not err in denying the defendants' motions for a directed verdict.

There is substantial evidence that the plaintiffs' grain, at least in part, was in storage and that the plaintiffs did not receive payment in full when the grain was authorized for sale because it had previously been converted by Great Basin. There was also substantial evidence of conversion with respect to that portion of Linderman's grain held by him in his own elevators to justify submitting the case to the jury, under the legal theories of the defendants' liability decided below.

We also hold that the district court did not err in denying defendants' motions for a directed verdict at the close of the case and for judgment notwithstanding the verdict. The evidence in these cases was in considerable conflict at the close of the trial. However, we continue to adhere to the following guidelines:

"By substantial, it is not meant that the evidence need be uncontradicted. All that is required is that the evidence be of such sufficient quantity and probative value that reasonable minds *could* conclude that the verdict of the jury was proper." (Emphasis in original.) *Mann v. Safeway Stores, Inc.*, supra, 95 Idaho at 736, 518 P.2d at 1198.

At the end of the presentation of the evidence, the jury could reasonably have concluded that the plaintiffs' grain had been converted, and that the defendants were liable. Our determination of these issues is supported not only by the evidence discussed above, but by the law applicable to these cases which we set out below.

### III.

### APPEAL OF SMITH AND LINDERMAN (NO. 11938)

The district court was also presented with motions by the defendants for a new trial. These motions were granted by the district court unless the plaintiffs would accept remittiturs in the amounts of their judgments, reducing Linderman's judgment from $19,978.58 to $1,820.22, and Smith's judgment from $10,431.04 to $2,500.00. The remittiturs were refused by the plaintiffs, and the district court then entered its order of a new trial. On their appeal, the plaintiffs assign error to the district court's orders of remittiturs and a new trial.

The plaintiffs argue that the district court erred in ordering remittiturs because the defendants' motions for a new trial did not allege that the jury's verdicts were excessive, and because the district court did not carefully review the evidence to determine that the verdicts were excessive as required by Idaho law. However, we need not consider these contentions inasmuch as Smith and Linderman rejected the remittiturs, and our disposition of the new trial issue renders the issue of the remittiturs moot.

■ The plaintiffs assign error to the order of a new trial in two respects. First, they argue that the defendants' motions were defective because the grounds stated

for the motions were broad generalities and not particularized references to the alleged insufficiencies in the evidence, or to the way in which the verdict was contrary to the weight of the evidence. Second, plaintiffs argue that the trial court's order of a new trial did not adequately specify its reasons, that is the conflicts in the special interrogatories which necessitated a new trial. Our consideration of these issues is narrowed by the rule that where the order granting a new trial expressly states the ground upon which it is granted, the issue on appeal will turn on whether the particular ground stated would justify the granting of the motion. *Dawson v. Olson*, 95 Idaho 295, 298, 507 P.2d 804, 807 (1973); *Rosenberg v. Toetly*, 93 Idaho 135, 139, 456 P.2d 779, 783 (1969); *Ricard v. Gollen*, 91 Idaho 335, 336, 421 P.2d 130, 131 (1966); *Sanchotena v. Tower Co.*, 74 Idaho 541, 545, 264 P.2d 1021, 1023 (1953).

■ If the sole ground for the order of a new trial had been the insufficiency of the evidence, the defendants' motion for a new trial would be defective under the accepted standard. *Paullus v. Liedkie*, 92 Idaho 323, 326, 442 P.2d 733, 736 (1968). However, the trial court also ordered a new trial on the ground that the answers in the special jury verdicts were internally inconsistent. The defendants' motions do allege that the verdicts were uncertain, inconsistent and contradictory and that the motions were made on the basis of the evidence adduced at trial. Although the defendants' allegations are close to being deficient, in the unique circumstances of these cases, where the trial court and all the parties were aware of a problem with at least the Smith verdict as soon as the verdicts were read in court, we hold that the defendants' motions were not defective. They met the purposes of the requirement of specifications: identifying the relevant facts relied upon and giving notice to the opposing party. *Fignani v. City of Lewiston*, 94 Idaho 196, 198, 484 P.2d 1036, 1038 (1971). I.R.C.P. 61 also supports our rejection of the plaintiffs' argument on this point.

■ There is no dispute that the trial court gave the *grounds* for its order of a new trial in the order entered after the hearing on the motion and by reference in the final judgment and order. Plaintiffs object to the alleged inadequacy of the *reasons* given by the trial court for its decision. We have previously held that a trial court is not required to specify its reasons for granting a new trial, *Deshazer v. Tompkins*, 93 Idaho 267, 270, 460 P.2d 402, 405 (1969), although we encourage trial courts to do so. Examination of the record shows that the trial court here did set out its reasoning at some length. We agree with the trial court that the answers in the special verdicts returned by the jury were inconsistent. The Smith verdict was inconsistent in that it first found that Smith had stored all of his wheat and barley, and then found that he had sold all of the barley and all but $10,431.04 of the wheat. The Linderman verdict was inconsistent because it first found that Linderman had stored only the amount of grain worth $1,820.22, but then found that $19,978.58 worth of grain had been converted.

■ Although the ground stated by the trial court in its order of a new trial is not explicitly set forth in the statutes or rules, it is encompassed within the language of former I.C. § 10–608 (repealed effective March 31, 1975, S.L. 1975, ch. 242, § 1; *see* I.R.C.P. 59(d) ) and I.R.C.P. 49(b). The trial court is entrusted with a sound judicial discretion to be exercised in granting or refusing to grant a new trial. The exercise of that discretion will not be disturbed on appeal unless it clearly appears to have been manifestly abused. *Blaine v. Byers*, 91 Idaho 665, 671, 429 P.2d 397, 403 (1967); *Sanchotena v. Tower Co., supra*, 74 Idaho at 547, 264 P.2d at 1024. We do not find the trial court's discretion to have been manifestly abused. It is apparent that the trial court understood the cases clearly and saw the inconsistency in the jury's special verdicts. The more liberal rule applied to orders granting a new trial recognizes the advantage enjoyed by the trial court in

reviewing the case because of the court's active participation in the trial. *Walker v. Distler*, 78 Idaho 38, 45, 296 P.2d 452, 456 (1956). The record here amply demonstrates the proper exercise of that advantage. Therefore we affirm the order granting a new trial.

 Plaintiffs also assign error to the trial court's failure in its order granting a new trial to specify the issues to be tried upon re-trial. A determination of the issues to be retried after the granting of a new trial is committed to the discretion of the trial court. I.R.C.P. 59(a); *Mendenhall v. MacGregor Triangle Co.*, 83 Idaho 145, 151, 358 P.2d 860, 863 (1961). In these actions the trial to the jury concerned solely the factual issue of the storage and conversion, or sale, of the plaintiffs' grain. The remaining factual issues on the liability of the individual defendants as directors and statutory trustees of Great Basin were left to the trial court. Clearly the factual issue tried by the jury must be retried, and because of our disposition of the remaining issues, they also must be retried. While it would have been a better practice for the trial court to have clearly specified the issues to be retried in its order of a new trial, the failure to do so was not an abuse of discretion. Nor does the trial court's failure here amount to error requiring reversal of its order. I.R.C.P. 61.

## ISSUES NECESSARY TO REMAND OF THE ACTIONS

Because our affirmance of the order granting a new trial necessitates a remand, we must consider and decide certain questions of law raised by the parties to these actions. I.C. § 1–205; *Messmer v. Ker*, 96 Idaho 75, 524 P.2d 536 (1974).

### IV.

The focal dispute in these cases has been conceived by the parties to be whether the plaintiffs' grain was stored with and converted by Great Basin, or sold to Great Basin. The reason for this concern is based upon the perception that the liability of the surety, Millers, on Great Basin's warehouseman's bond, turns upon the answer given to the central factual issue. The evidence outlined above is given different interpretations by the contending parties. Plaintiffs contend the evidence showed that their grain was converted; defendants argue that the plaintiffs' grain was sold to Great Basin.

If, upon the retrial, the trier of fact, or the court upon an appropriate motion, finds that each portion of Smith's and Linderman's grain was in fact converted *prior* to the time of any purported sale of the grain to Great Basin, then it is clear that the surety Millers is liable upon Great Basin's warehouseman's bond. I.C. §§ 69–208, –209. Particular attention should be given to the status of that portion of Linderman's grain held in his own elevator, as the record before us is indefinite as to the agreement between Linderman and Great Basin. The warehouse receipts-settlement sheets issued by Great Basin for said grain show weights in and grade, but are inconclusive on the existence of any agreement or course of trade between Linderman and Great Basin for the use of Linderman's elevator by Great Basin. This issue is open to proof upon the retrial. On the record before us, we intimate no opinion whether Great Basin could have converted that grain, or whether Great Basin's warehouseman's bond covers grain not held in Great Basin's facilities.

If, on the other hand, there is a question on when the so-called conversion took place, if at all, and it is determined by the trier of fact, or the trial court upon an appropriate motion, that there was in fact no conversion of any portion of the grain but that each portion was sold in the usual course of business, then the trial court must make two further determinations. First, the court must find the terms and conditions of the sale and determine the results following therefrom under the applicable provisions of the UCC, I.C. §§ 28–2–101 et seq., 28 7–101 et seq. Second, the court must decide

whether in the event of a sale the surety Millers is liable on Great Basin's warehouseman's bond in view of the provisions of Title 69, Chapter 2, and Title 22, Chapter 14, Idaho Code, and any applicable rules and regulations of the Department of Agriculture promulgated thereunder.

## V.

The plaintiffs on their appeal also raise questions about the district court's decisions dismissing Ralph Heileson and Craig Mecham from the lawsuits in their individual capacity as directors of Great Basin and holding none of the individual defendants liable as statutory trustees of Great Basin. These decisions are important because the damages claimed exceed the limit of the surety's potential liability on its bond. Two questions are presented with respect to the defendants' liability as directors. First, under what circumstances and by what steps may a director of a private corporation resign? Second, what duty is owed to a warehouse corporation's depositors and creditors by the corporation's directors? Our holdings on these legal questions will remain to be applied to the facts of these cases as they are determined by the fact finder upon re-trial.

## A.

Plaintiffs argue that the attempted resignations of defendants Ralph Heileson and Craig Mecham as directors of Great Basin were ineffective because no successors were ever elected to fill their positions on Great Basin's board of directors. They rely upon a section of the Business Corporation Act, Title 30, Chapter 1, Idaho Code, § 30–101 et seq., and upon a provision in Great Basin's articles of incorporation. I.C. § 30–139(1) provides in pertinent part: "A director shall hold office for the term for which he was named or elected and until his successor is elected and qualified." Article IX of Great Basin's articles of incorporation reads in part: "The following persons shall be the officers and directors of this corporation . . . until their successors are duly elected and qualified . . . . Any officer or director may resign his office by written resignation filed with, or mailed to the Secretary of the corporation."

The last quoted provision of Article IX of Great Basin's articles of incorporation is permissive. Failure to properly submit a written resignation will not render an otherwise valid resignation ineffective. It should be noted that if there were a mandatory statutory provision or mandatory language in the articles of incorporation controlling the form and procedure for submission of a resignation, those provisions would be strictly followed. *See, e. g., Dillon v. Berg*, 326 F.Supp. 1214, 1223–24 (D.Del.1971), affirmed, 453 F.2d 876 (3rd Cir.1971). However, in the absence of statutory provisions or mandatory requirements of articles of incorporation or by-laws, a resignation of a corporate director is effective at common law whether made orally or in writing, is effective immediately unless made conditional, and is effective without acceptance by the corporation. *Briggs v. Spaulding*, 141 U.S. 132, 154, 11 S.Ct. 924, 931, 35 L.Ed. 662 (1891); *Hall v. Gulf South Utilities*, 48 So.2d 637, 638 (Miss.1950); *Hoffman Beverage Co. v. Forrest Mart Tid Bit Shop*, 135 N.Y.S.2d 795, 797 (N.Y.City Ct.1954). It is sufficient that a director give notice to the corporation of intent to resign and thereafter refrain from acting as a director of the corporation. *B.F. Goodrich Rubber Co. v. Helena Motor Car Co.*, 53 Mont. 526, 165 P. 454, 455 (1917); Annot., 20 A.L.R. 267 (1922).

Plaintiffs place the greatest reliance on the statutory provision that a director remains in office until a successor is elected and qualified. No decision of this Court has interpreted the crucial language. However, the majority interpretation, which we accept, is that this language provides for a director to hold over in office after the expiration of his or her term until a successor is elected and qualified. It does not prevent an earlier resignation by a di-

rector made in good faith. *Briggs v. Spaulding, supra* ; *Schuckman v. Rubenstein,* 164 F.2d 952, 956 (6th Cir.1947), cert. denied, 333 U.S. 875, 68 S.Ct. 905, 92 L.Ed. 1151 (1948) (applying Ohio law); *Modern Heat & Power Co. v. Steamotor Corp.,* 239 Iowa 1267, 34 N.W.2d 581, 585 (1948); 2 Fletcher Cyc. Corp. § 345, at 141 (perm. ed. 1969 rev.). We also note that Great Basin's articles of incorporation (Article VIII) require officers and directors to be stockholders. Any voluntary, good faith transfer of a director's entire interest in the corporation's stock operates both to disqualify him or her to hold the office of director and to divest him or her of title to the office. *Chemical National Bank v. Colwell,* 132 N.Y. 250, 30 N.E. 644, 645–46 (1892). Whether a director has resigned, or has ceased to be qualified to hold or to hold title to, office as a director, are questions of fact to be determined from the. circumstances of each case. *Modern Heat & Power Co. v. Bishop Steamotor Corp., supra.*

While the ability of a corporate director to resign is nearly unlimited in many respects, we must state here an important limitation. A corporate director is a fiduciary to the corporation and must discharge the accompanying responsibilities in good faith and with reasonable diligence and skill. I.C. § 30–142.

### B.

If it is determined that the directors of a bonded warehouse corporation have not resigned and are in office, the question then arises of what duty is owed by the directors to the corporation's depositors and creditors. Separate treatment is required for depositors first and then creditors. If it is found that the plaintiffs' claims against the directors individually arise because of a conversion of stored grain by the corporation, the directors' duty of care has been decided by this Court before. Although there is authority to the contrary or which applies a less exacting standard to the conduct in office of bonded warehouse corporation directors, we believe the standard announced by this Court over sixty years ago has been, and continues to be, an appropriate one in this area. On retrial the trial court is directed to follow our decision in *Frontier Mill. etc. Co. v. Roy White etc. Co.,* 25 Idaho 478, 490–91, 138 P. 825, 829 (1914), and instruct the jury accordingly, if there is evidence of a conversion of the grain. *See generally* : 3A Fletcher Cyc. Corp., § 1140 (perm. ed. 1975 rev.); Annot., 29 A.L.R.3d 660 (1970); Annot., 25 A.L.R.3d 941 (1969); Annot., 152 A.L.R. 696 (1944).

However, if the plaintiff's claims arise from a failure of the bonded warehouse corporation to pay the purchase price of the plaintiff's grain, two broad categories must be distinguished. The first category takes in those cases where the grain has been consigned to the warehouse corporation to be sold on commission, or for the consignor's open account. When the proceeds from a sale of the grain are then received by the warehouse corporation from the buyer, the corporation holds the proceeds as an agent of the producer-seller and must account for them. The officers and directors of the corporation who knowingly participate in the intentional misapplication of the proceeds, or who knowingly permit the corporation or other officers and directors to do so, are jointly and severally individually liable, along with the corporation, for the loss to the producer-seller. *American Agricultural Chemical Co. v. Barnes Co.,* 28 F.Supp. 73, 74–75 (E.D.S.C. 1939); *Darling & Co. v. Fry,* 24 S.W.2d 722, 723–24 (Mo.App.1930); *Cone v. United Fruit Growers' Ass'n,* 171 N.C. 530, 88 S.E. 860, 861–62 (1916); *Olin Mathieson Chemical Corp. v. Planters Corp.,* 236 S.C. 318, 114 S.E.2d 321, 325–27 (1960); *Hawkins v. Lane,* 3 Tenn.App. 221 (1926); *Dodson v. Economy Equipment Co.,* 188 Wash. 340, 62 P.2d 708, 709 (1936); 3A Fletcher Cyc. Corp., § 1142 (perm. ed. 1975 rev.). *See Duncan v. Williamson,* 18 Tenn.App. 153, 74 S.W.2d 215, 218–19 (1933).

The second general category takes in those situations where the grain is sold directly to the warehouse corporation and

there exists a debtor-creditor relationship between the corporation as buyer and the producer as seller. Upon the failure of the corporation to perform its promise to pay on the contract of sale, the seller's remedy is an action in damages against the corporation for breach of the contract. The general rule is that corporate directors are not personally liable to creditors on corporate debts or contracts. 19 Am.Jur.2d "Corporations," § 1341 (1965). If the corporation has forfeited its corporate charter, the seller must pursue his claim against the corporation in an action against the statutory trustees, *see* I.C. § 30–611 and discussion in Section VI, *infra.*

An area of potential director liability exists in those cases in which the corporation cannot meet its obligations to its creditors because the directors have caused the assets of the corporation to be appropriated to their own use or distributed to the stockholders, to the injury of the corporation's creditors. The essence of the creditor's claim for relief in such cases is that the actions of the directors, or of those directors who knowingly permit or who under all the circumstances should have known of such use of the corporation's assets, work a fraud on the corporation's creditors. As this Court said over fifty years ago:

" . . . It may be conceded that generally in an action for deceit or fraud the facts constituting the same must be specifically alleged and proven. But this rule has no application to the case of an officer of a corporation obtaining a preference for himself by appropriating to his own use the assets of his company, to the injury of its other creditors. Such acts are fraudulent and void in law, irrespective of the intent of such officer.

"In *Riley v. Callahan*, 28 Idaho 525, 155 P. 665, it is said that the directors and officers of a corporation hold the funds in trust, and any attempt on their part to divert the use of such funds to their personal profit or interest is a violation of the trust imposed by virtue of their office. . . .

. . . . .

" . . . In the instant case, the president, who is also the general manager and a director of a corporation, as such officer caused the corporation to enter into a contract with himself in his individual capacity, by which all of the then remaining assets of the corporation were transferred to him to discharge its obligation to him. Even though such obligation is founded on a valid consideration, such as the advancement of money, which appears to be conceded in this case, his subsequent sale of this property under foreclosure proceedings and his purchase of the same at the sale was in legal effect an unlawful conversion of this property to his own use, and he becomes liable to account for the same to any creditor of the company who has suffered loss by reason of such wrongful act. The transaction, entirely aside from his good faith, is fraudulent in law and voidable at the instance of a creditor." *Nelson v. Jones*, 38 Idaho 664, 669–71, 224 P. 435, 437–438 (1924).

*See Associated Fruit Co. v. Idaho-Oregon Fruit Growers' Ass'n*, 44 Idaho 200, 204–05, 256 P. 99 (1927); *Weil v. Defenbach*, 31 Idaho 258, 262–63, 170 P. 103 (1918); 3A Fletcher Cyc. Corp., § 1185 (perm. ed. 1975 rev.). *See also* 3A Fletcher Cyc. Corp., §§ 1180–1183 (perm. ed. 1975 rev.).

## VI.

Plaintiffs also challenge the decision of the district court holding none of the individual defendants liable as statutory trustees of Great Basin. Statutory trustees are provided for as follows by I.C. § 30–611:

"§ *30–611. Trustees for defaulting corporation and stockholders.*—In all cases of forfeiture under the provisions of this chapter, the directors or managers in office of the affairs of any domestic corporation whose charter may be so forfeited, or of any foreign corporation whose right to do business in this state may be so forfeited, or any other person or persons who may be appointed by any court of competent jurisdiction to perform that

duty, are deemed to be trustees of the corporation and stockholders or members of the corporation whose power or right to do business is forfeited, and have full power to settle the affairs of the corporation, and to maintain or defend any action or proceeding then pending in behalf of or against any of said corporations, or to take such legal proceedings as may be necessary to fully settle the affairs of said corporation, and such directors or managers, as such trustees, may be sued in any of the courts of this state after such forfeiture by any person having a claim against any of said corporations."

A limitation on the liability of statutory trustees is that only those directors "in office" on the date the corporate charter is forfeited become statutory trustees. Directors who have effectively resigned under the standards stated above, *see* V.A., are not "in office."

█ Although a corporation which has forfeited its charter cannot have a judgment entered against it or be made a party to an action, *Jolley v. Puregro Co., supra,* the statutory trustees of such a corporation may properly be sued on any claim against the corporation and judgment may be entered against them in their capacity as trustees. *Fortner v. Cornell,* 66 Idaho 512, 518–19, 163 P.2d 299, 301 (1945); *Caxton Printers, Ltd. v. Ulen,* 59 Idaho 688, 692–93, 86 P.2d 468, 469–70 (1939); *Mitchell v. Munn Warehouse Co.,* 59 Idaho 661, 675, 86 P.2d 174, 179–80 (1938) (any implication in the language of *Mitchell v. Munn Warehouse Co.* contrary to *Jolley v. Puregro Co., supra,* is expressly disapproved).

██ The statutory trustees may also be personally liable for any breach of their fiduciary obligation to wind up the affairs of the corporation, collect its assets, pay the creditors, and distribute the balance, if any, rateably among the stockholders. *See* I.C. §§ 30–611, 30–610, 30–159, 8–601(5) and 8–602. *Cf. Fortner v. Cornell, supra* ; *Associated Fruit Co. v. Idaho-Oregon Fruit Growers' Ass'n,* 44 Idaho 200, 204–05, 256 P. 99 (1927); *Nelson v. Jones,* 38 Idaho 664, 668–

71, 224 P. 435 (1924); *Weil v. Defenbach,* 31 Idaho 258, 262–63, 170 P. 103 (1918); *Riley v. Callahan Mining Co.,* 28 Idaho 525, 538, 155 P. 665 (1916); *Wilson v. Baker Clothing Co.,* 25 Idaho 378, 387, 137 P. 896 (1913); *King v. Coosa Valley Mineral Products Co.,* 283 Ala. 197, 215 So.2d 275, 279 (1968); *Whatley v. Wood,* 157 Colo. 552, 404 P.2d 537, 541 (1965); *Dick v. Petersen,* 90 Colo. 83, 6 P.2d 923, 926 (1931); *Word v. Union Bank & Trust Co.,* 111 Mont. 279, 107 P.2d 1083, 1083, 1085 (1940); *Heaney v. Riddle,* 343 Pa. 453, 23 A.2d 456, 458 (1942); 16A Fletcher Cyc. Corp. §§ 8174, 8186 (perm. ed. 1962 rev.). In addition, if after the forfeiture of the corporate charter the trustees continue to conduct the business of the corporation, they may become personally liable for any obligations incurred. *See* I.C. § 30–610; *Borbein, Young & Co. v. Cirese,* 401 S.W.2d 940, 943 (Mo.App.1966). *Cf. Sullivan Construction Co. v. Twin Falls Amusement Co.,* 44 Idaho 520, 528, 258 P. 529 (1927); *Ferguson Fruit & Land Co. v. Goodding,* 44 Idaho 76, 88, 258 P. 557 (1927); *Trower v. Stonebraker-Zea Live Stock Co.,* 17 F.Supp. 687, 689–90 (N.D.Okl.1937); *Todd Shipyards Corp. v. Lomm,* 190 So.2d 125, 128–29 (La.App.1966); *Word v. Union Bank & Trust Co., supra* ; 3A Fletcher Cyc. Corp. § 1249, at 408 (perm. ed. 1975 rev.). Whether any of the statutory trustees may become personally liable to the plaintiffs will depend upon the facts of the case.

## VII.

█ The last question of law we must address is the issue of whether plaintiffs are entitled to recover attorney's fees against the surety, defendant Millers. Great Basin, Kent Heileson and Millers assign error to the district court's decision awarding plaintiffs $12,500.00 as attorney's fees. Defendants argue that plaintiffs were not entitled to attorney's fees under the Bonded Warehouse Law which should control over the provisions of the general insurance statutes, that the amount of attorney's fees awarded did not bear a reasonable relationship to the amounts of the

judgments, and that the district court erred in awarding attorney's fees before their motions for new trial had been ruled upon.

We point out first that the award of attorney's fees was not made prior to the entry of final judgment, but was made at the same time. The defendants' motions for a new trial were not pending. They had been granted unless the plaintiffs would accept remittiturs. *Dawson v. Olson*, 94 Idaho 636, 642, 496 P.2d 97, 103 (1972). There was no error by the trial court in holding a hearing prior to the entry of final judgment to determine the amount of attorney's fees to be awarded, and in awarding the attorney's fees at the time final judgment was entered.

We must also disagree with defendants' argument that the amount of an award of attorney's fees must bear a reasonable relationship to the amount of the judgment. It is the rule in this jurisdiction that where attorney's fees are to be awarded the amount thereof is to be that sum which the trial court in its discretion determines is reasonable. The factors to be considered have been previously stated by this Court:

> "What is a reasonable attorneys' fee is a question for the determination of the court, taking into consideration the nature of the litigation, the amount involved in the controversy, the length of time utilized in preparation for and the trial of the case and other related factors viewed in the light of the knowledge and experience of the court as a lawyer and judge; it is not necessary in this connection that he hear any evidence on the matter although it is proper that the court may have before it the opinion of experts." *Halliday v. Farmers Insurance Exchange*, 89 Idaho 293, 300, 404 P.2d 634, 638 (1965) (quoting *Penrose v. Commercial Travelers Insurance Co.*, 75 Idaho 524, 539, 275 P.2d 969, 978 (1954) ).

At the hearing held in these cases on the amount to be awarded plaintiffs as attorney's fees, evidence on these factors was introduced and considered by the trial court. Upon the event of the re-trial in these cases the trial court will again have to determine what amount is a reasonable attorney's fee, if attorney's fees are to be awarded.

The argument most strenuously urged by the defendants is that plaintiffs are not entitled to attorney's fees in their action against the surety because the Bonded Warehouse Law did not explicitly provide for the award of attorney's fees in such actions until 1974. In that year I.C. § 69–209, the section providing for an action by an injured person against the surety on the warehouseman's bond, was amended by the addition of the following sentence: "Any person who sues and obtains a judgment against the warehouseman and/or his surety for payment of such damages under this section shall be entitled to recover a reasonable attorney's fee." S.L. 1974, ch. 82, § 1, effective July 1, 1974. Defendants argue that the omission of a provision for attorney's fees in the Bonded Warehouse Law as it was in effect at the commencement of these trials must control over the general provision for attorney's fees, I.C. § 41–1839, in the insurance code, Title 41, Idaho Code, § 41–101 *et seq.* I.C. § 41–1839, the relevant insurance code provision, states:

> *"41–1839. Allowance of attorney fees in suits against insurers.*—(1) Any insurer issuing any policy, certificate or contract of insurance, surety, guaranty or indemnity of any kind or nature whatsoever, which shall fail for a period of thirty (30) days after proof of loss has been furnished as provided in such policy, certificate or contract, to pay to the person entitled thereto the amount justly due under such policy, certificate or contract, shall in any action thereafter brought against the insurer in any court in this state for recovery under the terms of the policy, certificate or contract, pay such further amount as the court shall adjudge reasonable as attorney's fees in such action.
>
> (2) In any such action, if it is alleged that before the commencement thereof, a

tender of the full amount justly due was made to the person entitled thereto, and such amount is thereupon deposited in the court, and if the allegation is found to be true, or if it is determined in such action that no amount is justly due, then no such attorney's fees may be recovered. (3) This section shall not apply as to actions under the workmen's compensation law which are subject to section 72–611, Idaho Code. This section shall not apply to actions against surety insurers by creditors of or claimants against a principal and arising out of a surety or guaranty contract issued by the insurer as to such principal, unless such creditors or claimants shall have notified the surety of their claim, in writing, at least sixty (60) days prior to such action against the surety. The surety shall be authorized to determine what portion or amount of such claim is justly due the creditor or claimant and payment or tender of the amount so determined by the surety shall not be deemed a volunteer payment and shall not prejudice any right of the surety to indemnification and/or subrogation so long as such determination and payment by the surety be made in good faith. Nor shall this section apply to actions against fidelity insurers by claimants against a principal and arising out of a fidelity contract or policy issued by the insurer as to such principal unless the liability of the principal has been acknowledged by him in writing or otherwise established by judgment of a court of competent jurisdiction."

We do not agree with defendants' argument. The language of I.C. § 41–1839 is broad and by its very terms applies to "*Any* insurer issuing *any* policy, certificate or contract of insurance, *surety,* guaranty or indemnity of *any kind or nature whatsoever* . . . ." (Emphasis supplied.) An "insurer" includes a surety. I.C. § 41–103. Chapter 18 applies to "all insurance contracts," which includes surety bonds. I.C. §§ 41–1801, 102 and 2601 *et seq.* The exemptions of § 41–1839(3) and § 41–1801 are so specific that only the legislature could

add to them. Moreover, § 41- 1839(3) explicitly contemplates the application of the section to actions against surety insurers where sixty days' notice has been given.

Finally, we do not agree with defendants' argument that the addition of a provision for attorney's fees to I.C. § 69–209 in 1974 gives rise to the inference that prior to the amendment no attorney's fees were to be awarded in actions on warehousemen's bonds. The silence of the legislature prior to 1974, in the face of I.C. § 41–1839, is hardly indicative of an intent not to award attorney's fees in such actions. In our view I.C. § 41–1839 is more probably evidence that the legislature did not think it necessary to provide specifically for attorney's fees in such actions. It is also possible that the 1974 amendment to § 69–209 was prompted more by the legislature's reaction to conflicting language in several of our opinions interpreting the requirements of I.C. § 41–1839, than by the thought that the amendment was necessary to provide for attorney's fees in actions on warehousemen's bonds. Under I.C. § 69–209, as amended, the only requirement for entitlement to an award of attorney's fees is success in obtaining a judgment. We conclude that the plaintiffs are entitled to attorney's fees under I.C. § 41–1839, if the requirements of that section are met. In *Associates Discount Corp. of Idaho v. Yosemite Ins. Co.,* 96 Idaho 249, 526 P.2d 854 (1974), we resolved conflicts among the prior cases and held that:

"under I.C. § 41–1839, any person who has a claim under a policy of insurance and who furnishes proof of loss as provided in the statute may recover attorney fees against the insurer if the amount ultimately recovered in the action exceeds the amount tendered by the insurer before the commencement of the action." 96 Idaho at 257, 526 P.2d at 862.

Upon retrial, should the facts or situation warrant, the court can also consider I.C. § 12–120(2):

"*12–120. Attorney fees in civil actions.—*

. . . . .

"(2) In any civil action to recover on an open account, account stated, note, bill, negotiable instrument, or contract relating to the purchase or sale of goods, wares, or merchandise, unless otherwise provided by law, the prevailing party shall be allowed a reasonable attorney fee to be set by the court, to be taxed and collected as costs."

The amount of attorney's fees to be awarded is left to the discretion of the trial court, subject to the requirement that they be reasonable in the light of the factors stated above.

The order granting a new trial is affirmed and the cases are remanded for further proceedings. No costs allowed.

McFADDEN, C. J., and SHEPARD and DONALDSON, JJ., concur.

BAKES, Justice, concurring in part and concurring in the result in part:

I concur in Parts I, IV, V, VI, and VII, and concur in the result in Parts II and III of the opinion of Judge Scoggin.