768 P.2d 787

**Selma MONTGOMERY, Thomas Montgomery, Alice Flower and Selma Montgomery as Personal Representative of the Estate of John C. Montgomery, deceased, Plaintiffs–Appellants,**

v.

**John Clayton MONTGOMERY, Defendant–Respondent.**

No. 16757.

Supreme Court of Idaho.

Feb. 6, 1989.

Laird B. Stone, Twin Falls, for plaintiffs-appellants.

Lee E. Schlender, Hailey, for defendant-respondent.

HUNTLEY, Justice.

John Clayton Montgomery received, by deed, a gift of Texas real property from his father, Jack Montgomery, two month's before his father's death. Upon submission of Jack Montgomery's Will to probate, Selma Montgomery, (Jack Montgomery's widow), Thomas Montgomery, (Jack Montgomery's son), and Alice Flower (Jack Montgomery's daughter) ("Appellants"), who were all beneficiaries of the will, brought this action seeking to invalidate the gift on the bases of diminished mental capacity and/or undue influence.

A special jury verdict was returned finding that the deceased, Jack Montgomery, was not suffering from diminished mental

capacity when he signed the Deed and that John Clayton Montgomery had not used undue influence in obtaining his father's signature on that Deed. Post-trial motions for judgment notwithstanding the verdict and for new trial were denied.

## I.

Jack Montgomery made his last will and testament on February 22, 1974. The will provided that his wife, Selma Montgomery, should have a life estate in all of the real property he owned at the time of his death with the remainder being divided in equal shares among his children, Tom Montgomery, Alice Flower, and John Clayton Montgomery.

In August of 1982, Jack Montgomery was diagnosed as having lung cancer. During or shortly after the time a biopsy was performed he suffered a massive stroke affecting primarily the left side of his brain.

Shortly before the stroke, Jack Montgomery allegedly had a conversation with his personal attorney, Gale Dake, in which he reaffirmed his intent to dispose of his property exactly as he had done in his will, giving a life estate in everything to his wife with the remainder to be equally divided among his three children.

The Texas property is oil producing property which had been held in the Montgomery family by Jack Montgomery and his two sisters. Each tenant-in-common received one-third of the royalties from the property. John Clayton Montgomery recorded the deed October 18, 1982 and received approximately $36,000 in income during the year subsequent to Jack's death. Since the filing of this action, Jack's one-third of the total proceeds have been held by the oil company. In July of 1982, Jack Montgomery took John Clayton Montgomery to Texas for a family meeting where he allegedly told his sisters and his son that he was going to "give him Texas" —meaning that he intended to transfer his interest in the Texas property to John Clayton and thereby "keep this property in the family."

On October 9, 1982, at a time when Jack Montgomery was suffering the effects of the cancer and the stroke, John Clayton Montgomery procured from Jack Montgomery a signature on a deed granting all of Jack's interest in the Texas property, excepting a life estate in himself, to John Clayton Montgomery. John Clayton Montgomery personally arranged for notarized execution of the deed and did not provide his father with independent advice even though he was aware of his father's illness.

On October 10, the day following the execution of the deed, Alice Flower arrived at the Jack Montgomery residence. She testified that she found her father unable to speak except to say "yes" and "no" in garbled tones, which responses were not always appropriate. He was unable to comprehend the spoken word except for the most basic concepts. Alice stated that although Jack Montgomery had been involved in farming for most of his life, his condition was such that he could not identify pictures of farm implements, nor could he comprehend inquiries concerning such things as whether or not he wanted a drink of water.

At trial, Dr. Ron Miciak, Jack Montgomery's treating physician, testified that Jack was suffering from a left side stroke involving his speech centers and ability to comprehend. He further testified that Jack Montgomery could not have been able to understand the language of a deed on October 9, 1982, due to the complex nature of the instrument. In the opinions of Mary Michener, a speech and language pathologist, and Dora Lee Harrell, a home health nurse, Jack Montgomery could not have understood the complex language of the deed. Ms. Hashman, the notary, stated that when she saw Jack Montgomery his head was bowed and it was her belief he gave no indication that he comprehended what had been said to him or what he was doing. She testified that she had been a notary public for 35 years and that this was the first time that she had ever notarized a signature in which it appeared to

her that the signing party did not know what he was doing.[1]

John Clayton Montgomery testified he presented the deed to his father by saying "grandpa, this is a deed to transfer title of Texas to me and you to retain a life estate" and he repeated this three times. John Clayton Montgomery called two witnesses, Evelyn Sanders (Jack Montgomery's sister) and Rocco DeVillier (a physical therapist who treated the deceased). Neither witness was with Jack Montgomery on October 9. Each testified that Jack Montgomery understood what he was doing on October 9, 1982, when he signed the deed.

## II.

Appellants' post-trial motion for judgment notwithstanding the verdict or, in the alternative, for a new trial, was correctly denied. The court accurately stated the standard applicable for disposition of such a motion.

> Such motions will be granted if there is not substantial and competent evidence to support the verdict. *Brand S. Corp. v. King*, 102 Idaho 731 [639 P.2d 429] (1981); *Owen v. Burkum [Burcham]* 100 Idaho 441 [599 P.2d 1012] (1979). And by "substantial" it is not meant that the evidence be uncontradicted but that the evidence be of sufficient quantity and probative value that reasonable minds could conclude that the verdict of the jury was proper. *Smith v. Great Basin Grain Co.*, 98 Idaho 266 [561 P.2d 1299] (1977); *Hibbler v. Fisher* [109 Idaho 1007] 712 P.2d 708 (Idaho Ct.App.1985). It is not easy to express precisely why the jury could have concluded that the decedent was competent to make that deed. A significant consideration is the lack of satisfying demonstration by plaintiff's witnesses that their observations required the conclusion that the decedent was not competent. And there was some testimony by defendant and his witnesses from which it is possible to conclude that the decedent was competent. On this basis it is not possible for this Court to grant the plaintiffs' motion for a judgment notwithstanding the verdict, pursuant to Rule 50, I.R.C.P.

The jury found that Montgomery had the mental capacity to understand the nature and effect of his act in signing and delivering the deed. The jury then turned to the issue of whether or not undue influence had been exerted on the grantor. They found that there was no undue influence.

The trial court correctly denied the post-trial motion upon concluding that the jury findings were supported by substantial and competent evidence. The jury performed its office as finder of fact and, in accordance with the due deference to which the jury is entitled when functioning within its province as fact-finder, we refuse to discount conclusions supported by substantial and competent evidence and to require a trial *de novo*. Whether or not we believe we would have arrived at the same result had we been trier of fact, well established principles of appellate process dictate that we not disturb either the jury's resolution of the case or the trial court's refusal to disturb the jury's decision. The Court has reviewed appellant's other assignments of error and has concluded they are without merit.

AFFIRMED. Costs to respondent, no attorney fees awarded.

SHEPARD, C.J., and BAKES, BISTLINE and JOHNSON, JJ., concur.

---

**1.** Ms. Hashman testified as follows at trial:

I think that the next thing that happened is Johnny laid the paper down on his father's lap and said, 'This is where you are to sign.' I think first, though, he said, 'Do you know what this paper contains.' And I didn't hear anything from the father. I think that he was very unaware of anything at the time, it seemed to me. And I think he was just told where to sign and he signed it.